# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 20, 2011

No. 09-10950

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

KENNETH MICHAEL WILCOX,

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before BARKSDALE, STEWART, and SOUTHWICK, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Defendant-Appellant Kenneth Michael Wilcox ("Wilcox") was arrested, indicted and stood trial on three counts of felony kidnapping. Upon conviction, Wilcox was sentenced to 480 months for each charge, to run concurrently. Wilcox brings this appeal challenging certain pre-trial rulings, evidentiary rulings, and the computation of his sentence. We AFFIRM.

## I.

In the fall of 2008, under the pretense of a trip to a Six Flags theme park, Wilcox took three minor children unrelated to him from Lubbock, Texas to Idabel, Oklahoma. The children ranged in ages: A.C., an 8-year old boy; J.B., a 12-year old girl; and L.T., a 14-year old girl. J.B. and A.C. are siblings. Wilcox

No. 09-10950

met the three children at his apartment complex.  The parents of A.C. and J.B., Joe and Juanita, were Wilcox's neighbors.  L.T., whose mother worked at and for the same apartment complex, lived there also with her mother.

Wilcox and his eight-year old son, B.W., lived in transient conditions. Their apartment had very little furniture and lacked gas service for heating water.  Because of this, Joe and Juanita permitted Wilcox to shower at their home.  Joe and Juanita also often shared meals with Wilcox and his son.

Despite Wilcox's very modest living conditions, he conveyed to Joe and Juanita a desire to take their children on an all expenses paid trip to the theme park as a reward for academic achievement.  Joe and Juanita's consent was attainable, in part, by Wilcox's past generosity towards the children in the form of trips to the shopping mall, skating rink and Chuck E. Cheese's pizzeria.  At trial, Juanita testified that she was unable to take her children on such excursions because she did not have a car and suffered from financial hardship.

All parents had concerns about this trip, which Wilcox assuaged.  To address Juanita's concerns, Wilcox made a reservation at the El Dorado casino in Shreveport, Louisiana, and indicated to her that this would be where the group would stay the second night of the trip. When Joe expressed additional concerns about allowing the children to accompany Wilcox, Wilcox explained that if the trip were canceled, Wilcox would require Joe to pay certain non-refundable expenses.  Joe obliged and permitted the children to go with Wilcox. Moreover, the parents of the children were under the impression, from Wilcox, that there would be other adults, besides Wilcox, chaperoning the group. Juanita believed B.W.'s mother would be accompanying the group. Meanwhile, L.T.'s mother believed Juanita would be going along.  Lastly, Wilcox represented that B.W. would accompany the group on the trip yet, unbeknownst to the rest of the group, B.W. would only accompany the group for the first leg of the trip.

2

No. 09-10950

Before leaving Lubbock, Wilcox made several purchases, including: camouflage coveralls, a military duffel bag, cotton canvas, a dog collar, a 3.5-quart pot, sharpeners, 8-millimeter carabiner clips, a camp mirror, a shovel, five gallons of water, fire starters, tarp, a lantern, rubber ties, pinto beans and crackers. Wilcox also went to an adult gift store and purchased novelty handcuffs from the "love section" within that store.[1]

The group left Lubbock on October 24, 2008, and their first stop was Amarillo, Texas. Once in Amarillo, Wilcox dropped off B.W. with B.W.'s biological mother, an idea which Wilcox had planned with B.W.'s mother for weeks, yet failed to inform the parents of the other children. Wilcox proceeded with the remaining three children to Idabel, Oklahoma, and arrived early the next morning, 70 miles short of Texarkana. Later that day, despite protests from the children that the group continue on to Six Flags, Wilcox and the children camped in the woods of southeastern Oklahoma that evening using the tent and supplies Wilcox purchased in Lubbock. The reservation at the El Dorado was never used.

On October 26, 2008, Wilcox returned the group to Idabel, Oklahoma, to look for a cell phone he claimed to have lost at a Wal-Mart a day earlier. He told the manager he was looking for his phone but refused to use the store's phone upon the manager's offer. While in Idabel, Wilcox told the children he had a million dollars buried in the woods, and assured the three children that if they helped him find the money, he would distribute portions in the following amounts: J.B. would receive a million dollars; L.T. would receive one thousand dollars; A.C. would receive three thousand dollars. For extra assurance, Wilcox

---

[1] Upon his arrest and when questioned as to this specific purchase, Wilcox indicated that the intended recipient of the handcuffs was his cousin's wife. Upon further questioning, Wilcox could not recall her name. When authorities questioned the intended recipient, she indicated such a gift would have been a shock because Wilcox did not regularly furnish her with gifts and that she did not like spending time with the defendant.

3

wrote and gave J.B. a check for a million dollars.  While they searched for the money, Wilcox shared stories about his friends in the area and their proclivity to torture, kill and cannibalize girls.  During this time, Wilcox inexplicably placed his hand on J.B.'s body, including her stomach.

Later, Wilcox rendezvoused with various friends whom he knew (having grown up in the area), and utilized their assistance to further his plot.  He also shared with the children increasingly frightening stories about his friends. Wilcox told the children that his friends would pick up girls and tie them up; that his friends wanted to buy the two girls; and, that the only way to escape was to kill or be killed.  Wilcox asked L.T. if she was willing to die or become a sex slave, and explained that his friend wanted to make sex slaves of the two girls.  For J.B., the conduct became so appalling that she believed Wilcox was going to sell L.T.  For her part, L.T. indicated she was terrified when Wilcox took the girls to a friend's home, pointed to a hook, and indicated that it was for hanging women to torture them.  At this time, Wilcox produced the novelty handcuffs he purchased in Lubbock and placed them on L.T.  The children reiterated their desire to return home.  Wilcox did not relent.

Wilcox maintained his torment of the children into October 27, 2008.  He told L.T. and J.B. that his friends had raised their offering price for the girls.  By now, B.W.'s mother had grown suspicious of Wilcox and alerted individuals whom she knew in Idabel.  She informed them that Wilcox might be in the area and that they should be on the lookout for him.  Thereafter, one of the friends she called arrived home to find that Wilcox had abandoned  L.T. and A.C. there. Wilcox's friend alerted authorities, after which L.T. and A.C. were reunited with their parents.  J.B. remained with Wilcox.

Wilcox took J.B. to the home of another acquaintance, whereupon that friend informed him that he had become the subject of media attention for having abducted the children. Wilcox declined the use of a phone and proceeded

No. 09-10950

to a secluded camp site where he spent the night with J.B., under the same cover, in the same sleeping bag. On October 28, 2008, Wilcox left the camp site with J.B. whereupon he was pulled over and arrested by McCurtain County Sheriff's personnel between Horatio, Arkansas and Idabel, Oklahoma. J.B. was reunited with her family. Wilcox was indicted on federal kidnapping charges.

Prior to trial, Wilcox moved to dismiss the indictment for improper venue pursuant to the Federal Criminal Code and Rules 18 and 21(a). He also moved to change venue. The district court denied both motions without a hearing. At trial, in addition to evidence relating to A.C., J.B., and L.T., the Government introduced evidence about two women whom Wilcox had previously taken to southeastern Oklahoma: Sharon Sherman and Nilda Castro.

As was the case with the three minor victims in this case, Wilcox lured both Sherman and Castro to the Ark-La-Tex region under false pretenses, shared stories of friends who enjoyed raping and killing people, and wrote each a check of one million dollars as placation. The only material difference between the stories of Sherman and Castro, and the ordeal of the minor victims in this case is the manner in which the respective abductions ended. With Sherman, Wilcox deserted her at B.W.'s mother's home in Texarkana, after Sherman attempted twice to escape. For Castro, she was able to successfully escape while the two were staying at a casino hotel in Shreveport, Louisiana.

The district court permitted the evidence and reasoned it was relevant to Wilcox's plan, motive, intent, action, lack of accident, or mistake, pursuant to Federal Rule of Evidence 404(b). A jury convicted Wilcox of all three counts. The district court sentenced Wilcox to 480 months for each charge, to run concurrently. This appeal followed.

II.

On appeal, Wilcox argues that the district court erred in the following respects: it erroneously denied his request for a change of venue; it improperly

5

influenced the presentment of evidence when it instructed his counsel to "move-on" during cross-examination of J.B.; it failed to, *sua sponte*, instruct the jury to disregard a portion of the prosecutor's statement during summation; it improperly handled a question from the jury during deliberations; and, at sentencing, it erroneously applied a vulnerable victim enhancement to his prison term, pursuant to § 3A1.1(b)(1) of the United States Sentencing Guidelines ("Sentencing Guidelines").

A.

Wilcox argues that the district court's decision to deny his motion for a change of venue, and to do so without the benefit of a hearing, constitutes reversible error. Wilcox also argues that the district court's failure to conduct individual *voir dire* of each juror jeopardized his right to a fair trial. The decision to deny a motion to transfer is reviewed for abuse of discretion. *United States v. Lipscomb*, 299 F.3d 303, 338 (5th Cir. 2002). A district court abuses its discretion when it makes an error of law or "if it bases its decision on a clearly erroneous assessment of the evidence." *Id.* at 338–39 (internal citations and quotation marks omitted). We review the decision to transfer without a hearing under the same standard: abuse of discretion. *United States v. Powell*, 354 F.3d 362, 370 (5th Cir. 2003). Before turning to the district court's decision to refuse transfer, we consider the district court's decision to reject Wilcox's application without the benefit of a hearing.

We start with the premise that Wilcox was not entitled to a hearing on his motion for a change of venue. *Id.* As such, the decision to hold a hearing is discretionary. Entitlement to a hearing ripens only when the defendant "alleges sufficient facts which, if proven, would justify [transfer of venue]." *Id.* (quoting *United States v. Mergist*, 738 F.2d 645, 648 (5th Cir. 1984)). Thus, our consideration of the district court's decision to deny Wilcox a hearing on his

No. 09-10950

application to transfer is intertwined with his underlying entitlement to a change of venue.

A district court is not required to grant a motion to transfer venue pursuant to Rule 21 of the Federal Rules of Criminal Procedure, absent a strong showing of prejudice. *Lipscomb*, 299 F.3d at 340. A "court must transfer [a criminal] proceeding . . . to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." *Skilling v. United States,* 130 S.Ct. 2896, 2913 n.11 (2010). When pretrial publicity is the basis for relief under Rule 21, a defendant must show that "the publicity inflamed the jury pool, pervasively prejudiced the community against the defendant, probatively incriminated [him], or exceeded the sensationalism inherent in the crime." *Lipscomb*, 299 F.3d at 343 (internal citations omitted).

Here, the record shows that the basis of Wilcox's complaint of pretrial publicity consists of a story from the website of a local news station[2] and a series of "blog" postings by one individual on a lone website. Outside of the record, Wilcox contends that other statements could have prejudiced the jury, namely statements by a state legislator, a local "Amber-Alert," and 85 references to the defendant by another television affiliate.[3] The Government contends that Wilcox's submissions gave no indication of where these "blog" postings could be found or who was their readership. Additionally, the Government finds Wilcox's

---

[2] The news article was eight paragraphs long. The record does not speak to its dissemination beyond local media websites, nor do either parties' merits briefs discuss the number of visits the website received.

[3] In his motion to transfer, Wilcox explains that the local news website publicizing his story was CBS Lubbock, Texas affiliate KCBD. The papers also explain that the references by a state legislator were made by Carl Isett and were made in the context of using Wilcox's alleged behavior as the impetus to reformulate the criteria employed by the State of Texas in implementing statewide "Amber Alerts."

No. 09-10950

claims of prejudice incredulous given Wilcox's inability to preserve within the record more than one piece of evidence suggesting prejudice.

The publicity here does not rise to the level of prejudicial pretrial publicity that this court, and the Supreme Court, have used as the basis of relief pursuant to Rule 21. For example, in *Skilling* the Supreme Court considered the convictions of a former chief executive officer of Enron, the former Houston-based energy conglomerate, and at one time the seventh highest-revenue-grossing company in America. *See generally Skilling*, 130 S.Ct at 2911. Enron's abrupt and calamitous bankruptcy invited a government investigation which uncovered a massive conspiracy. Skilling argued that community vitriol made it impossible for him to receive a fair trial in Houston. *Id*. at 2912. The district court rejected Skilling's arguments. This court found a presumption of prejudice but explained that it had been remedied by prophylactic *voir dire. United States v. Skilling*, 554 F.3d 529, 561 (5th Cir. 2009), *vacated in part on other grounds*, 130 S.Ct. 2896 (2010). The Supreme Court affirmed the district court's decision to deny Skilling's motion to change venue and concluded that even minimally, Skilling had failed to establish a presumption of prejudice. 130 S.Ct at 2915. An examination of the Supreme Court's other precedent makes clear that Wilcox has failed to establish his entitlement to relief under Rule 21 of the Federal Rules of Criminal Procedure.

In *Murphy v. Florida*, the Supreme Court refused to afford Rule 21 relief despite the fact that the defendant earned a moniker due to a brazen jewelry heist in New York (he was from New York), at a time when the defendant's capers took him up and down the eastern seaboard, and when press coverage was far less disseminated than now. 421 U.S. 794, 797 (1975).

In *Patton v. Yount*, 467 U.S. 1025 (1984), the Supreme Court upheld a murder conviction which, four years earlier, was previously overturned based on a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). *Voir dire* at retrial

8

revealed that over seventy-five percent of prospective jurors and over half of the seated jurors and alternates carried an opinion prior to retrial. The Supreme Court noted that time had soothed community outrage of the brutal murder and much of the adverse publicity had subsided by the time of retrial. *Yount*, 467 U.S. 1034. Thus, denial of transfer was not inappropriate.

For media attention to warrant Rule 21 relief, the pretrial publicity must be pervasive in nature so as to support a finding of prejudice. In *Marshall v. United States*, 360 U.S. 310 (1959), the Supreme Court overturned a conviction, during a trial for dispensing drugs without a prescription, because seven jurors were exposed to many news accounts relaying that Marshall had previously been convicted of forgery, that he and his wife had been arrested for narcotics offenses, and that he practiced medicine without a license. *Id.*

Put differently, as the Supreme Court explained, a presumption of prejudice "attends only in the extreme case." *Skilling*, 130 S.Ct. at 2915. If defendants in *Skilling*, *Murphy*, and *Yount* failed to meet their burden in establishing entitlement to transfer, then Wilcox's application based on the relatively scant media attention here fails by comparison. Yet for Wilcox, even if this court were to find a presumption of prejudice, the presumption would be rebuttable by an examination of the *voir dire* procedure. *United States v. Chagra*, 669 F.2d 241, 249–50 (5th Cir. 1982), *abrogated in part on other grounds by Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407 (1985).

Here, the *voir dire* process presents no infirmities that compel reversal. For example, before empaneling the jury, the district court asked prospective jurors preliminary questions relating to pretrial publicity and allowed counsel to do the same. The district court asked if prospective jurors read or heard anything that may touch upon this case in any way. Then, asking if any jurors would have difficulty considering only the evidence presented, two prospective jurors raised their hands and were promptly dismissed. The district court

No. 09-10950

repeated its inquiry and afforded defense counsel another opportunity to inquire with jurors as to any predispositions emanating from pretrial publicity. Defense counsel embraced the opportunity and asked again for a show of hands of who had been exposed to pretrial publicity. Four additional prospective jurors indicated they heard news accounts. These four did not serve on Wilcox's jury.

Defense counsel again polled the empaneled jurors. The empaneled jurors gave assurances that they would examine only the evidence presented and would hold the Government to its high burden. At *voir dire*, Wilcox did not object to a single juror for cause. "When the basis for a challenge to a juror is timely shown, the failure to object constitutes a waiver of the right to attack the composition of the jury." *Dawson v. Wal-Mart Stores*, 978 F.2d 205, 209 (5th Cir. 1992).

When compared to the mountain of publicity in *Skilling*, *Murphy*, and *Yount*, Wilcox's complaints are unavailing, and certainly fail to reach the heights of *Marshall*. Moreover, the district court, as gatekeeper of the *voir dire* process, ensured that an impartial jury was seated. *See generally Chagra*, 669 F.2d at 250. Finding no abuse of discretion in the district court's decision to deny Wilcox's application, we affirm the district court's judgment to deny Wilcox's application to change venue. Accordingly, because we find the district court did not err in its decision to deny Wilcox's motion for a change of venue, we find the district court did not abuse its decision to do so without a hearing and thus, we find no reversible error. *See generally Powell* 354 F.3d at 370.

B.

Wilcox argues that the district court improperly limited his ability to cross-examine J.B. Wilcox suggests that the district court's instruction to "move-on" precluded his ability to properly explore any inconsistency between A.C's account of the trip and that of J.B.'s. Review of a district court's limitation of cross-examination, and thus, a violation of the Confrontation Clause, is *de novo*; in the

10

No. 09-10950

absence of a Sixth Amendment violation, we review the limitation for abuse of discretion. *United States v. Jimenez*, 464 F. 3d 555, 558–59 (5th Cir. 2006).

"A defendant's right to cross-examine witnesses against him is a constitutional right secured by the Confrontation Clause of the Sixth Amendment." *United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004) (citing *United States v. Mayer*, 556 F.2d 245, 248 (5th Cir. 1977)). It thus follows that a judge's discretionary authority "comes into play only after there has been permitted as a matter of right sufficient cross examination to satisfy the Sixth Amendment." *United States v. Restivo*, 8 F.3d at 274, 278 (5th Cir. 1993) (internal citations and quotations omitted). The Confrontation Clause is satisfied when defense counsel has been allowed to expose the jury to facts from which the jury could appropriately draw inferences relating to the reliability of the witness. *Id.* To demonstrate abuse of discretion, the defendant must show that the limitation was clearly prejudicial. *Id.* Put differently, a defendant must show that a reasonable jury might have had a significantly different impression of witness credibility if defense counsel had been allowed to pursue the questioning. *United States v. Maceo*, 947 F.2d 1191, 1200 (5th Cir. 1991).

If a defendant's rights under the Sixth Amendment were violated, this court next determines whether the error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986). The Supreme Court has articulated factors to assess the harm of an abbreviated cross-examination that could potentially affront a defendant's rights under the Confrontation Clause, including: (1) the importance of the witness's testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence of testimony corroborating or contradicting the testimony of the witness on material points, (4) the extent of the cross-examination permitted, and (5) the overall strength of the Government's case. *Id.* at 684.

No. 09-10950

Here, Wilcox's rights under the Confrontation Clause were not violated. The thrust of Wilcox's Confrontation Clause complaint arises out of J.B.'s inability to recall if she saw a hook as a means of torture during the trip and her confusion surrounding the inability to remember whether she told an examining nurse, upon reunification with her parents and authorities, if Wilcox had sexually abused her. A review of the transcript reveals that the district court only directed defense counsel to "move-on" after J.B. started crying, presumably out of distress, because of her inability to remember the details of a "hook," and what (small) role it played in this bizarre expedition. A review of the record deems error, if any at all, harmless. Furthermore, Wilcox was neither charged nor convicted with sexual assault or torture. Therefore, the district court's admonition that counsel move past questioning J.B. about the hook does not constitute reversible error.

Furthermore, an application of the *Van Arsdall* factors underscores the harmless nature of any error. True, J.B.'s testimony as one of three kidnapping victims was critical, but the court's direction to move past an insignificant issue was inconsequential, and thus harmless. The Government presented *overwhelming* evidence of Wilcox's guilt in the form of two other complaining minor victims with virtually identical stories to those of two separate, unrelated victims, to say nothing of other witnesses that testified. As such, and in light of *Van Arsdall*, the district court's limit of Wilcox's ability to cross-examine J.B. was utterly harmless, beyond a reasonable doubt, and not of such gravity so as to even consider vacating Wilcox's convictions. As the Supreme Court has previously explained, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original). Here, the veracity of J.B.'s account of the material facts is hardly in question. In light of Wilcox's appeal, premising

12

No. 09-10950

a Confrontation Clause appeal on twin issues of compelling immateriality is inconsequential. Finding no reversible error, we affirm the district court's ruling to limit J.B.'s cross-examination.

C.

Wilcox argues that the district court *sua sponte* should have ordered the jury to disregard that portion of the Government's summation during rebuttal that referred to the testimony of Sherman and Castro. When defense counsel raises no objection to the Government's closing argument, the statements made in argument are reviewed for plain error. *United States v. Davis*, 487 F.3d 282, 284 (5th Cir 2007) ("*Davis II*").[4]

Under a plain error standard, reversal is only appropriate if "(1) there was error, (2) the error was clear and obvious, and (3) the error affected [the defendant's] substantial rights." *Id.* (internal citations and quotations omitted). "[R]eversal is discretionary." *Id.* The discretion is only exercised if the error "seriously affects the fairness, integrity or public reputation of the judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (internal citations and quotations omitted).

Wanting this court to ignore the fact that his counsel at trial did not object to the Government's closing argument, Wilcox takes exception to the district court's failure to instruct, *sua sponte*, the jury to disregard a rhetorical distinction of negligible difference. At closing argument, Wilcox's counsel listed a parade of horribles regarding his resources and feared that this would adversely reflect on Wilcox. Upon rebuttal, the prosecutor retorted:

> Members of the jury . . . I'm afraid that, not
> withstanding the difficulty [Sherman] and [Castro] had

---

[4] This case bears no relationship to *United States v. Davis*, 393 F.3d 540, 548 (5th Cir, 2004) discussed in Section II.B, *supra*. To avoid any confusion, the second case is referenced with a "II" following its short citation.

No. 09-10950

> in coming in here and sitting 50 feet away from this
> man, that you wouldn't understand the seriousness of
> what he's done to people, what he does with them in the
> woods.

Implicit in Wilcox's appeal is his contention that the Government somehow tricked the jury into considering the stories of Sherman and Castro in a manner that went beyond the original basis for its admission in this case—Rule 404(b). Put differently, Wilcox is concerned that the statement was considered by the jury not as the basis of a plan, intent, etc., but that the prosecutor's rhetoric invited an inference that Sherman and Castro were in fact victims and that Wilcox went beyond intent and planning, and consummated both plots.

Wilcox's arguments are meritless for at least two reasons. First, the jury was repeatedly instructed on how to handle the testimony of Sherman and Castro. This court has held that such an instruction cures any impropriety or inference of impropriety, in the admission of prior bad acts evidence. *See, e.g., United States v. Willis*, 6 F.3d 257, 262 (5th Cir. 1993).

Furthermore, the district court's evidentiary ruling does not constitute plain error. This court's decisions in *Davis II* and *Olano* make clear that appellate courts give considerable deference to the judgment of the district court when conducting plain error review. Here, Wilcox's hurdle is a high one: he must show that the district court's failure to act constituted clear and obvious error that affected the outcome of the proceedings. Even still, this court should only intervene if the error compromised the fairness, integrity, or public reputation of the judicial proceedings.

An examination of the weight of the evidence can hardly support the conclusion that the error of which Wilcox complains—the district court's failure to interrupt the Government's closing argument, without prompting from defense counsel—affected the outcome of the proceedings. Assuming *arguendo*

14

that the district court should have *sua sponte* interrupted the Government's closing argument, the jury still considered the independent testimony of Wilcox's three victims, the stories behind their respective ordeals, the testimony of the parents of the children, and the other key pieces of evidence that comprise this ordeal. Given the totality of the evidence and the subjectivity of the error (if any), *see Puckett v. United States*, 129 S.Ct. 1423, 1429 (2009), the district court's failure to object *sua sponte* during closing argument does not constitute plain error. Even if it did, we refuse to exercise our discretion to reverse.

Here, in light of the weight of the evidence presented at trial, any purported error does not impugn the judicial process, and this court will not reverse on these grounds. As such, this court finds no reversible error in the district court's administration of the trial and the parties' summations and affirms the judgment of the district court on this issue.

D.

Wilcox next argues that the district court erred in its treatment of a note from the jury during deliberations that referred the panel to the jury charge and jury instructions.

We begin our analysis of Wilcox's complaint on this issue with the understanding that district courts are "afforded great [discretion]" in responding to jury questions. *See generally Barton's Disposal Serv., Inc. v. Tiger Corp.*, 886 F.2d 1430, 1434 (5th Cir. 1989). When there is no objection to the trial court's instructions to the jury, this court reviews those instructions for plain error. *United States v. Betancourt*, 586 F.3d 303, 305–06 (5th Cir. 2009).

As discussed above, to establish plain error, an appellant must show a forfeited error that is clear and obvious and that affected his substantial rights. *Davis II*, 487 F.3d at 284. An error affects substantial rights only if it affected the outcome of the district court's proceedings. *Id.* As it is not mandatory, "the court of appeals has the discretion to remedy the error" and only exercises such

discretion "if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings." *Olano*, 507 U.S. at 736 (internal citations and quotations omitted).

Here, Wilcox's complaint of prejudice from the district court's handling of the jury question is baseless. Before discussing the contents of the note at issue, two points will be mentioned: first, the jury instructions adopted by the district court were identical to the instructions Wilcox proposed to the district court; second, these instructions are identical to this court's pattern jury instructions, which is presumably where Wilcox obtained the language in the first place.

That said, we turn to the contents of the communication at issue. During deliberations, the jury sent the following note to the district court:

> Is the term "inveigle"and "kidnap" mutually exclusive? Or can we replace "kidnap" with "inveigle"? For example, that the defendant kidnapped (inveigled) the person for some benefit.

To which, the district court suggested the following response:

> I am unable to answer your question. You must consider the charge and instructions of the court as a whole, along with the evidence, as you continue with your deliberations.

The district court asked if there was any objection to its response and both the Government and defense counsel explicitly stated they had no objection. Here, because the district court directed the jury to the original jury charge, and because the jury charge was an accurate statement of the law, the district court's response was acceptable. *See United States v. Arnold*, 416 U.S. 349, 359 n.13 (5th Cir. 2005). Moreover, "as we have said before, there is no error if the trial judge . . . charges exactly as he was requested." *United States v. Ehrlich*, 902 F.2d 327, 330 (5th Cir. 1990) (internal citations and quotations omitted).

Furthermore, given the totality of the evidence and the subjectivity of the error (if any), *see Puckett*, *supra*, the court's response and the ratification of the response by the parties does not constitute plain error.   Even if it did, the decision to reverse is discretionary.   Here, in light of the weight of the evidence presented at trial, any purported error does not impugn the judicial process and the court will not exercise its discretion to reverse on these grounds.   As such, this court affirms the district court's judgment in its treatment of the jury question.

E.

Lastly, Wilcox takes issue with the district court's calculation of his sentence.   The district court cites both age and economic status as the basis for the two-level, vulnerable victim enhancement.   At sentencing, the district court explained, "[t]hese children were young children, came out of economic circumstances that I guess you could really describe as poverty level."   Wilcox protests the conclusion that the victims here—children, between the ages of eight to fourteen, of modest economic means—were vulnerable victims as that term has been defined in § 3A1.1(b)(1) of the Sentencing Guidelines and the corresponding commentary.

Review of a district court's interpretation of the Sentencing Guidelines is *de novo* and review of a district court's application of "unusual vulnerability" in the arena of sentencing is for clear error.   *United States v. Lambright*, 320 F.3d 517, 518 (5th Cir. 2003) (internal citations and quotations omitted).   With respect to the application of the adjustment, this court must determine whether the district court's conclusion was plausible in light of the record as a whole.   *Id.*

The Sentencing Guidelines provide a two-level adjustment if the offense involved unusually vulnerable victims.   U.S.S.G § 3A1.1(b).   The commentary with respect to subsection (b) states "vulnerable victim" means a person who is "unusually vulnerable due to age, physical or mental condition, or who is

No. 09-10950

otherwise particularly susceptible to the criminal conduct." U.S.S.G § 3A1.1, cmt. 2 n.1. Wilcox contends that neither age nor economic status should merit application of the vulnerable victim enhancement.

1.

We begin our review of the district court's enhancement based on the victims' age with the understanding that the determination of whether a victim is vulnerable is a factual finding that the district court is best-suited to make. *United States v. Burgos*, 137 F.3d 841, 842 (5th Cir. 1998) (citing *United States v. Rocha*, 916 F.2d 219, 244 (5th Cir. 1990)). "[V]ulnerability is a complex fact dependent upon a number of characteristics . . . Thus, the district court's determination . . . is entitled to due deference." *Rocha*, 916 F.24 at 244.

Wilcox argues that applying a sentencing enhancement based on the victims' minor status on a conviction for kidnapping is redundant and that the enhancement is in fact inherent in the charge. The offense here, felony kidnapping, under 18 U.S.C. § 1201(a)(1) and (g)(1), requires that the victim be under the age of eighteen. 18 U.S.C. § 1201 (a)(1). Yet, the cases Wilcox cites as support for his redundancy argument—*United States v. Moree*, *United States v. Gonzales*, and *United States v. Medina-Argueta*—actually support the district court's vulnerable victim enhancement.

In *Moree*, this court vacated a criminal sentence, imposed after a conviction for conspiring to obstruct justice, because of an improper application of the vulnerable victim enhancement, and remanded to the district court for resentencing. 897 F.2d 1329, 1335–36 (5th Cir. 1990). The court explained that "a condition that occurs as a necessary prerequisite to the commission of a crime cannot constitute an enhancing factor," *id.* at 1335, and found lacking from the defendant's state of mind any indication that he chose his purported co-conspirator, who was in actuality an FBI informant, based on vulnerability of handicap or *age. Id.* at 1335–36. Thus, *Moree* recognized that age can be a basis

18

of vulnerability, but that the defendant in *Moree* "did not show an extra measure of depravity which § 3A.1.1 intends to more severely punish." *Id.* at 1336.

In *Gonzales*, this court affirmed a district court's vulnerable victim enhancement and recognized that the enhancement is appropriate when the victim presents an "unusual vulnerability which is present in only some victims of that type of crime." 436 F.3d 560, 585 (5th Cir. 2006) (internal citations and quotations omitted). Moreover, *Gonzales* explains that a defendant challenging a vulnerable victim enhancement cannot seek shelter from the enhancement by arguing that the enhancement is inapplicable because it is only intended to punish targeting a vulnerable victim. *Id. Gonzales* indicates that, so long as the defendant knew or should have known of the vulnerability, then the enhancement is appropriate. *Id.* Lastly, in *Medina-Argueta*, this court found that the objective conditions of a defendant's immigrant-smuggling enterprise did not support the enhancement. The conditions under which the immigrants were held in an "uncomfortably hot" 15'x15' apartment, and endured varying degrees of stress did not support the applicability of the enhancement as they did not place the victims in the same category as the young, old, or sick. *United States v. Medina-Argueta*, 454 F.3d 479, 482 (5th Cir. 2006). There, the victims' classification of immigrants did not make them unusually vulnerable as that classification was a prerequisite of the crime of alien-smuggling. *Id.* (citing *United States v. Dock*, 426 F.3d 269, 273) (5th Cir. 2005). *Medina-Argueta* held that for the vulnerable victim enhancement to apply, victims must be members of society and "fall in the same category as the elderly, the young, or the sick." *Medina-Argueta*, 454 F.3d at 482 (internal citations and quotations omitted).

Additionally, we reject Wilcox's redundancy argument on alternate grounds. First, we cannot ignore the fact that, as the Government articulated at oral argument, there is a material difference between a teenager on the eve of adulthood and the ages of the victims in this case. Thus, we are persuaded by

No. 09-10950

two opinions of this court. In *Dock*, this court affirmed the sentence of an immigrant-smuggler and the district court's application of a vulnerable victim enhancement. *Dock*, 426 F.3d at 271–72. In *Dock*, we rejected the defendant's arguments that the sentence was in contravention of *Moree*'s bar on enhancements based on elements of the charge. *Id.* at 272. It held that the district court's vulnerable victim enhancement was not based on the aliens' illegal status, but rather traits unique to Dock's specific victims which supported a finding that they were particularly susceptible. *Id.* at 273. The court in *Dock* found that because the aliens had been "kept isolated" in "cramped conditions," because they were "locked in a truck for twelve hours," and because the aliens "threw themselves at the mercy of their transporters," this made them particularly susceptible because not all aliens who enter this country find themselves in this position. *Id. Dock* continued, "[b]ecause the district court had the opportunity to observe several of the [victims] in the proceedings below, we defer to its finding that one or more of them were particularly vulnerable to the crime." *Id.*

Similarly, because the district court in Wilcox's criminal trial had the opportunity to observe A.C., J.B., and L.T., and because the district court cited their impressionability at sentencing, we read *Dock* to permit the vulnerable victim enhancement here, despite the minor status of the victims. We also find persuasive an unpublished opinion of this court which affirmed application of the enhancement in a case involving adolescent victims of a Medicaid fraud scheme. *United States v. Clopton*, 48 F. App'x 102 (5th Cir. 2002). In *Clopton*, the victims were eligible for enrollment in the federal program because of their status as minors. *Id.* That court did not find clear error in the district court's application of the vulnerable victim enhancement and thus, too, implicitly rejected the redundancy argument Wilcox makes here.

No. 09-10950

Both *Dock* and *Clopton* reinforce the notion that the "vulnerable victim guideline is primarily concerned with the impaired capacity of the victim to detect or prevent crime," *United States v. Gill*, 99 F.3d 484, 486 (1st Cir. 1996), or a victim who is "less able to resist than the typical victim of the offense of the conviction." *United States v. Angeles-Mendoza*, 407 F.3d 742, 747 n.5 (5th Cir. 2005) (internal citations and quotations omitted ). In that respect, the youth of the victims here mattered. Wilcox won the trust of his victims with amusements children would find attractive. The trip to Six Flags was, in reality, the culmination of enticements designed to accommodate the sensibilities of an 8-year old, a 12-year old, and even a 14-year old. Here, the ages of A.C., J.B., and L.T. stunted their ability to thwart Wilcox's plot.

Additionally, Wilcox's argument does not overcome the deference we accord to the district court. The inferences we draw after our own review of the whole record reinforce the plausibility of the district court's application of the enhancement. The record informs us that Wilcox manipulated the friendship his son enjoyed with A.C. to foment interest in a trip which was the pretext for the abduction. According to testimony adduced at trial, though Wilcox initially broached the idea of the trip to Joe and Juanita as a supposed reward for academic achievement, the idea was then cultivated, in earnest, between B.W. and A.C. during their shared time at the same school. Before long, A.C.'s interest in and desire to go on the trip deepened, became contagious, and soon infected his sister, J.C. She, in turn, promoted the idea to her friend, L.T. The genesis of the plot was the unique relationship Wilcox enjoyed with his son, B.W. B.W., in turn, was his father's unwitting conduit to the victims. Having lowered the defenses of the children, Wilcox then subjected his victims to a pattern of unimaginable psychological torment, in a secluded, wooded area unfamiliar to them, in conditions frightening even to grown adults. Our review of the entire

21

No. 09-10950

record supports the district court's finding that the maturity level of the children here rendered them "particularly susceptible" to Wilcox's plot.

Here, the victims were unusually vulnerable to Wilcox's plot, and thus the concerns inherent in *Moree* were obviated by a consideration of the individual victims, as prescribed by *Dock.* They were vulnerable members of society, and fell into a special category, pursuant to *Medina-Argueta.* Moreover, pursuant to *Gonzales*, the vulnerability here is present in only some types of victims of kidnapping. Put differently, Wilcox knew what he was doing. Thus, the district court's consideration of age, even when sentencing on a crime where age is inherent in the offense, was plausible in light of the *whole* record and not clearly erroneous. As such, Wilcox's redundancy argument fails.

2.

The trial also produced evidence that Wilcox utilized his personal financial resources to curry favor within a specific subset: youth well below the age of majority *and* of inadequate means. As explained above, the sentencing guidelines permit the enhancement if the victims were "particularly susceptible" to the criminal conduct. U.S.S.G § 3A1.1, cmt. 2 n.1. Wilcox argues that economic status should not be a factor in assessing the vulnerability of his victim. Yet, the case he cites for his argument is incongruous to this one.

In *United States v. Angeles-Mendoza,* this court rejected the term's applicability to illegal immigrant-victims and vacated the district court's sentences. 407 F.3d 742, 747 (5th Cir. 2005). In *Angeles-Mendoza*, the court concluded that immigrants seeking food and trying to support their families, etc., did not merit application of the term to them because they were not *unusually* vulnerable to the crime and that, nonetheless, such a classification "misses the mark" for qualifying vulnerability. *Id.* at 747.

Furthermore, Wilcox's argument is undermined by persuasive caselaw approving the application of the enhancement in economic contexts. Recently,

No. 09-10950

the Second Circuit affirmed a district court's vulnerable victim enhancement of a sex offender who traveled to Honduras and preyed on children that were homeless and without parental supervision. *United States v. Irving,* 554 F.3d 64, 75 (2nd Cir. 2009). That district court said that the enhancement was appropriate because "street urchins were especially vulnerable because anybody who comes along and offers the promise of a free meal has a special attraction to people in that economic and social circumstance. " *Id.*

Here, a review of the record reveals Wilcox in fact targeted his victims based on their susceptibility due to their financial position. Testimony adduced at trial revealed that Juanita lacked a car, much less the financial resources to accommodate an all expenses paid, three-day weekend diversion for her children. In fact, Juanita testified that she and her husband had financial difficulties and that Wilcox's generosity was welcome. For his part, Joe merely retreated from his opposition to the trip at the prospect that he may have to bear the cost of certain alleged non-refundable out-of-pocket expenses Wilcox claimed to have advanced for the trip. In a way, Joe's endorsement of and consent to the trip was coerced. Furthermore, the record reveals that L.T.'s mother worked at the apartment complex and laid carpet, introducing yet another element of economic want to Wilcox's victims.

Much the same way that trips to the skating rink, shopping center, and pizzeria proved enticing to children, we believe the amusements were at least equally irresistible to these specific children, victims "particularly susceptible" to the power of money to cloud judgment. Stated another way, a reasonable inference, based on the record as a whole, was that Wilcox chose his victims based on their economic hardship. This court's review on appeal requires consideration of the whole record for clear error, to determine if the district court's application of the vulnerable victim enhancement was plausible. In light of these facts, we see no clear error in the district court's sentence.

No. 09-10950

3.

A court of appeals may apply a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines. *Rita v. United States*, 551 U.S. 338, 347 (2007).  The dual categorization of the victims–economic modesty and minor status—and the deference we show to the district court, supports affirming the district court's sentence.  As such, because we find no clear error in the district court's calculation of Wilcox's sentence, and because application of the enhancement was plausible based on age or economic status, this court will leave undisturbed the two-level adjustment employed by the district court for the vulnerability of Wilcox's victims.

III.

None of the arguments presented by Wilcox compel disturbance of the judgment of the district court.  A review of the record, as well as an examination of the briefs, reveals Wilcox's perverse plot to manipulate and torment three children of very young and impressionable stations in life.  In light of the deference this court's standards of review provide a district court, Wilcox presents no argument of any moment to justify the relief he seeks.  As such, this court will AFFIRM the judgment of the district court in all respects.