**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 8, 2013

Lyle W. Cayce
Clerk

No. 12-60302

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

TIMOTHY ALLEN,

Defendant-Appellant

Appeals from the United States District Court
for the Northern District of Mississippi
USDC No. 2:10-CR-78-8

Before REAVLEY, JOLLY, and SMITH, Circuit Judges.

PER CURIAM:[*]

Appellant Timothy Allen and his co-defendants were convicted by a jury of conspiracy to commit wire fraud. He appeals his sentence, challenging four enhancements to his offense level and the district court's failure to apply a minor role reduction. For the reasons below, we AFFIRM.

I.

The relevant facts are as follows. In the alleged scheme, certain co-defendants ("callers") would place phone calls throughout the United States,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-60302

falsely notifying victims that they had won a large cash prize but that the prize could not be forwarded until the victim paid taxes and other fees through a Western Union or MoneyGram wire transfer. The caller would instruct the victim to send the money to another co-defendant (a "runner"). The runner would retain a portion of the payment for himself and transfer the remainder to the caller. The scheme took money from 91 victims, most of whom were elderly.[1]

Starting at the latest on November 21, 2008, Allen retrieved money for co-defendant Jarvis Jones. Jones was Allen's neighbor and was a runner in the wire fraud scheme. Jones asked Allen to help out with wire transfers because Jones was having trouble with his identification card. Allen retrieved money for Jones 12 times through January 10, 2009. Among these payments, Allen received money from victim Ozemai Toups three times during a three-day period; from Judith Holden three times; and from Sylvia Peare twice on the same day. Prior to November 21, 2008, Allen also gave Jones rides to Western Union and MoneyGram so that Jones could send and receive money, and Jones would sometimes pay Allen for giving him a ride.

Allen and his co-defendants were named in a 13-count indictment. In count one, he and his co-defendants were charged with conspiracy to commit wire fraud between January 2008 and July 2009. Allen's co-defendants pleaded guilty to that count. Allen proceeded to trial.

During his first trial, Allen testified that he was not guilty of the conspiracy with which he was charged. He denied knowing each of his co-defendants except Jones, whom he said he met in 2007. In particular, he stated that he never communicated with or sent money to co-defendants Patrick Beasley or George Coe, who were callers in the scheme. He testified that he did not know anything about the scheme and that he did not know the age of the

---

[1] In particular, FBI special agent Tiffany Stein testified that at least 63 of the 91 victims were over the age of 55, and that most of the victims were in their 70s and 80s.

people who sent money to Jones; that he never received less than $1,000; that he was always required to show identification when he retrieved money on Jones's behalf; and that he did not know who was sending the money to Jones and that he never asked Jones about it.  Further, he testified that prior to November 21, 2008, he never used Western Union or MoneyGram to receive money himself, and that after January 10, 2009, he had no contact with Jones and never retrieved any additional money.  Allen's first trial ended in a mistrial when the jury was unable to reach a verdict.

After the first trial, law enforcement agents continued to investigate Allen's activities and discovered additional evidence regarding wire transfers on January 9 and 10, 2009.  Two transfers were made from victim Toups to Allen; Allen signed his name on at least one of the transaction receipts when he received the money.  Another two transfers were made from someone named Tony Steward to co-defendant George Coe; at least one of the transaction receipts reflects Allen's signature.  The agents also learned that Allen used Tony Steward's phone number in several of his transactions.  Based on this and other evidence, the agents concluded that Allen had used Steward's name, address, and phone number to send money to Coe, but because the amounts were less than $1,000, Allen had not been required to show identification.[2]

During Allen's second trial, his co-defendants Patrick Beasley and George Coe testified.  Beasley testified that he used Allen and Jones as runners.  He further testified that he would sometimes "reload" victims, meaning he would call a victim again, tell him or her that the wire transfer had failed, and instruct the victim to resend the money.  According to Beasley, timing with runners was

---

[2] Tony Steward later testified during Allen's second trial that he had used MoneyGram and Western Union to send money to his daughter, but he never sent any money to George Coe, whom he did not know.  The first time Steward saw the two transaction receipts of a "Tony Steward" sending money to Coe was during trial preparation.

very important given the small window that existed before the victim realized no certified check was being delivered, and it was essential for the runners to understand the scheme so they would know to leave Western Union or MoneyGram immediately if the employees began to stall or sensed a problem. Beasley further testified that on occasion he directly communicated with Allen. Coe testified that he also used Allen as a runner, stating that although he initially used Allen through Jones, he later dealt directly with Allen.

Allen did not testify at his second trial. The jury found him guilty of the conspiracy charge. Following the guilty verdict, the probation officer prepared a presentence investigation report (PSR). The officer determined that Allen's total offense level was 29, which reflected (1) a base offense level of 7 pursuant to U.S.S.G. § 2B1.1(a)(1); (2) a 14-level increase pursuant to § 2B1.1(b)(1)(H) after concluding that Allen was responsible for $448,084 in total loss during the indictment's conspiracy dates; (3) a 4-level increase pursuant to § 2B1.1(b)(2)(B) because the offense involved 50 or more victims; (4) a 2-level increase pursuant to § 3A1.1(b)(1) because Allen knew or should have known that the victims were vulnerable; and (5) a 2-level increase pursuant to § 3C1.1 because Allen obstructed justice by testifying falsely at his first trial. Allen's advisory guidelines range of imprisonment was 87 to 108 months.

Allen objected to all of the enhancements to his base offense level, and also objected to the probation officer's failure to apply a minor role reduction. The district court overruled Allen's objections and sentenced him to 87 months imprisonment and four years of supervised release.

## II.

We review the district court's interpretation or application of the Sentencing Guidelines *de novo*, and its factual findings for clear error. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008). There is no clear error if the district court's finding is plausible in light of the record as a whole.

No. 12-60302

*Id.* The sentencing decisions objected to by Allen, namely the four sentencing enhancements and the failure to apply a minor role reduction, are all factual issues subject to clear error review.[3] We consider each issue in turn.

**A. Enhancement under § 2B1.1(b)(1)(H) to include the total loss amount and under § 2B1.1(b)(2)(B) based on the total number of victims**

Allen argues that he should not be held accountable for the total amount of loss or the total amount of victims, because "his involvement in the conspiracy was limited and his knowledge of the overall scheme was lacking." He asserts that at most he should have been accountable for the loss incurred and the victims involved from November 21, 2008 through January 10, 2009.

Under the Sentencing Guideline applicable to fraud, if the offense of conviction resulted in a total loss of $400,000 or more, but less than $1,000,000, the defendant's offense level is increased by 14 levels. § 2B1.1(b)(1)(H). If the offense of conviction involved 50 or more victims, but less than 250 victims, the defendant's offense level is increased by 4 levels. § 2B1.1(b)(2)(B). Allen does not dispute that the total loss resulting from the wire fraud conspiracy exceeded $400,000, nor does he dispute that the conspiracy involved 50 or more victims. His argument, rather, is that he should not be held responsible for the total loss and for the total number of victims because a defendant's base offense level is to be determined by his "relevant conduct" within the meaning of § 1B1.3, and Allen contends his "relevant conduct" was limited to his acts during the time period specified.[4]

---

[3] *United States v.* Jones, 475 F.3d 701, 705 (5th Cir. 2007) (amount of loss); *United States v. Ford*, 558 F.3d 371, 377 (5th Cir. 2009) (number of victims); *United States v. Villanueva*, 408 F.3d 193, 203 (5th Cir. 2005) (reduction for minor role); *United States v. Wilcox*, 631 F.3d 740, 753–54 (5th Cir. 2011) (vulnerable victim); *United States v. Juarez-Duarte*, 513 F.3d 204, 208 (5th Cir. 2008) (obstruction of justice).

[4] As is true for the other issues on this appeal, a determination of relevant conduct is a factual question subject to clear error review. *United States v. Ekanem*, 555 F.3d 172, 175 (5th Cir. 2009).

No. 12-60302

"It is well established that a defendant's base offense level for the offense of conviction must be determined on the basis of all 'relevant conduct' as defined in U.S.S.G. § 1B1.3." *United States v. Vital*, 68 F.3d 114, 117 (5th Cir. 1995). "A defendant's relevant conduct includes 'all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity.'" *United States v. Hammond*, 201 F.3d 346, 351 (5th Cir. 1999) (quoting § 1B1.3(a)(1)(B)). "We have interpreted this provision as requiring a showing that the conduct sought to be attributed to the defendant is both (1) reasonably foreseeable and (2) within the scope of the defendant's agreement." *United States v. Reinhart*, 357 F.3d 521, 526 (5th Cir. 2004).

The district court acknowledged that Allen's involvement with the conspiracy was different from that of his other co-defendants, and that Allen "did not enter into the conspiracy with [an] overall general knowledge of how this fraudulent scheme . . . worked." Nevertheless, the court found that the dates on which Allen relied failed to accurately reflect when he entered and exited the conspiracy. The district court stated that it did not believe Allen's testimony regarding the start and end of his involvement, emphasizing *inter alia* that Allen knew Jones as early as 2007, long before the start of the conspiracy; that Allen had given Jones rides to Western Union and MoneyGram prior to November 21, 2008; and that the court could not accept that Allen simply had no knowledge of the wrongdoing or criminal activity that the conspiracy involved.

We conclude that the district court did not clearly err in its relevant conduct finding. To begin, we re-emphasize that a relevant conduct finding requires both a finding of reasonable foreseeability and a finding that the defendant's agreement was within the scope of the criminal scheme. *Reinhart*, 357 F.3d at 526. As for reasonable foreseeability, it is plausible in light of the record as a whole that even if Allen did not enter the scheme with an overall understanding of how the scheme worked, it was nevertheless reasonably

foreseeable to him that the acts and omissions of other co-defendants as part of the scheme would lead to the resulting losses.

Allen argues, however, that the entire loss attributable to the wire fraud scheme was not within the scope of his agreement to participate in the scheme. He primarily relies on our decision in *United States v. Evbuomwan*, 992 F.2d 70 (5th Cir. 1993). His reliance is misplaced.

In *Evbuomwan*, the defendant was convicted of credit card fraud for obtaining a credit card under a false name. *Id.* at 72. Although the total loss attributable to Evbuomwan's fraud was $1,500, the district court calculated his sentence using a loss amount of $90,471. Of the $90,471, a large portion was attributable to losses arising from a separate check fraud scheme perpetrated against a bank by two other individuals. Evbuomwan had never been charged with participating in that check fraud scheme or for obtaining credit cards paid off with the checks received in that separate scheme. *Id.* We vacated the defendant's sentence, holding that the district court erred by not "ruling on whether Evbuomwan agreed to jointly undertake any criminal activity with [the two individuals responsible for the separate check fraud scheme], and if Evbuomwan did agree, whether the . . . check fraud scheme was within the scope of that agreement." *Id.* at 74.

The district court's error in *Evbuomwan* was that it held the defendant responsible for a separate criminal scheme without conducting a finding that the defendant was involved in that scheme. Here, although Allen might not have been involved with every aspect of the wire fraud scheme in which he participated, it was that very scheme that gave rise to his indictment, and the district court's findings dealt entirely with conduct arising out of the scheme. Contrary to Allen's reading, *Evbuomwan* does not stand for the proposition that where a defendant has participated in a criminal scheme, he is responsible under § 1B1.3 only for his own actions; indeed, that would be nonsensical,

No. 12-60302

because the point of § 1B1.3 is to hold a defendant responsible for the conduct of "*others*." Rather, *Evbuomwan* demonstrates that the scope prong of a relevant conduct inquiry looks to whether there was a jointly undertaken criminal activity, whether the defendant agreed to undertake that criminal activity, and whether the conduct of others was within the scope of the defendant's agreement. *See id.*[5] The district court did not clearly err in answering those questions in the affirmative.

Accordingly, we conclude that the district court did not clearly err in holding Allen responsible for the total amount of loss under § 2B1.1(b)(1)(H) and for the total number of victims under § 2B1.1(b)(2)(B).[6]

## B.  Failure to reduce for minor role under § 3B1.2(b)

Allen argues that the district court erred when it refused to reduce his offense level by two levels because, as a runner, he had a minor role in the offense.  If a defendant is a minor participant in an offense, his offense level should be decreased by two.  § 3B1.2(b).  A defendant is a "minor participant" in an offense if his role is more than minimal but he is "less culpable than most other participants."  § 3B1.2 cmt. n.5.  A defendant must show that he was "peripheral to the advancement of the criminal activity."  *United States v. Martinez-Larraga*, 517 F.3d 258, 272 (5th Cir. 2008).

---

[5] *See also* § 1B1.3(a)(1)(B) cmt. n.2 ("[T]he court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement).  The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision.  The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.").

[6] We came to a similar conclusion last year in a decision involving Allen's co-defendant, Scott Anthony Thomas.  *United States v. Thomas*, 476 F. App'x 14, 15 (5th Cir. 2012) (unpublished).  In *Thomas*, we concluded that the district court did not clearly err in its relevant conduct finding when it held Thomas responsible for the total loss amount of $448,084 resulting from the wire fraud scheme.

The district court found that runners like Allen were essential to the wire fraud scheme because they created a buffer between the caller and the victim by retrieving and resending the wired money. The court found that every role in the conspiracy was "very, very important," and thus that Allen was an average participant rather than a minor participant. These findings were not clearly erroneous.[7]

Accordingly, we conclude that the district court did not clearly err in refusing to apply a minor role reduction under § 3B1.2(b).

**C. Enhancement under § 3A1.1(b)(1) based on vulnerability of victims**

Allen argues that the district court erred when it increased his offense level pursuant to § 3A1.1(b)(1). He contends that he "never conversed with any victim or received any factual or other information that would have suggested the age or vulnerability of the victims." Pursuant to § 3A1.1(b)(1), a two-level increase applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." A "vulnerable victim" is defined as a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." § 3A1.1 cmt. n.2. The district court applied this sentencing enhancement because, although it had "no direct proof that [Allen] knew the victim[s] by name [or] by age," Allen nevertheless "should have known" about the age and vulnerability of the victims, especially because he retrieved money from some victims twice in the same day—i.e., he "reloaded." We conclude that the district court did not clearly err in its finding.

---

[7] Again, we came to a similar conclusion last year in our decision involving Allen's co-defendant Thomas. *See Thomas*, 476 Fed. App'x at 15 (holding the district court did not clearly err in not awarding Thomas a minor-role adjustment, where "the district court concluded that the role of runner was not peripheral but was an essential part of the scheme").

No. 12-60302

We note, as did the district court, that there was no specific evidence in the record showing that Allen was aware that he was receiving money from elderly victims.  We have never addressed whether a district court can find that a defendant who does not have access to the victims' personal information should have known of their vulnerability.  Relatedly, we have never addressed whether "reloading" is sufficient to support a finding that a defendant knew or should have known about his victims' vulnerability.

The Government cites case law from other circuits in which "courts have upheld applying the vulnerable victim enhancement to telemarketing victims who have been selected because they were successfully victimized in the past." *See, e.g.*, *United States v. Ciccone*, 219 F.3d 1078, 1086–87 (9th Cir. 2000) (stating that victims of "reloading" were "vulnerable"); *United States v. Day*, 405 F.3d 1293, 1295–96 (11th Cir. 2005) (applying increase where the victims were repeatedly targeted by the defendant's telemarketing charitable donation frauds).  Further, the Government cites the Seventh Circuit's resolution of this issue in an appeal by co-defendant George Coe.  *United States v. Coe*, 220 F.3d 573, 582 (7th Cir. 2000) (holding that where Defendants George Coe and David Beasley "reloaded" their victims, the district court did not err in applying a vulnerable victim enhancement).  However, a review of decisions from other circuits appears to indicate that a "reloader" is defined as a person who is the leader of the fraudulent scheme or who directly contacts victims who have already put money into the scheme.  *See, e.g.*, *United States v. Rosier*, 218 F. App'x 182, 184 (3d Cir. 2007); *United States v. Boyd*, 2 F. App'x 86, 88 (2d Cir. 2001); *Coe*, 220 F.3d at 582.

We find it unnecessary to adopt a bright-line rule with respect to reloading and instead conclude that this issue may be resolved on the facts specific to this case.  Even in the absence of knowing any victims' ages, Allen collected money in connection with a fraudulent scheme from the same individuals on multiple

occasions. Although he was not a leader of the scheme and did not personally contact any of the victims, he was involved in a large number of transactions, sometimes taking money from the same victim up to three times in a short period. It is plausible in light of the record as a whole that Allen should have known that the victims of this scheme were particularly susceptible to criminal conduct. As the district court phrased it, this finding was justified "because of . . . the mental state of someone that would send money twice in the same day under a scheme like this," and thus Allen "knew or should have known . . . that it was vulnerable victims that were sending these funds."

Accordingly, we conclude that the district court did not clearly err in applying a sentencing enhancement under § 3A1.1(b)(1) based on the vulnerability of the victims.

**D. Enhancement under § 3C1.1 based on obstruction of justice**

Finally, Allen argues that the district court erred when it increased his offense level pursuant to § 3C1.1, which provides for a two-level increase in the defendant's offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and this conduct was related to "the defendant's offense of conviction and any relevant conduct." Examples of such conduct include "committing, suborning, or attempting to suborn perjury." § 3C1.1 cmt. n.4(B). Allen contends that the district court erred in finding that he obstructed justice when he testified falsely during his first trial because the willfulness required by § 3C1.1 was not present in this case.

The district court's determination that a defendant obstructed justice under § 3C1.1 is a factual finding that we review for clear error. *Juarez-Duarte*, 513 F.3d at 208. Moreover, credibility determinations are peculiarly within the

11

No. 12-60302

district court's province. *United States v. Sotelo*, 97 F.3d 782, 799 (5th Cir. 1996).

The record supports the district court's perjury finding. Allen testified in his first trial that he did not know George Coe or Patrick Beasley, and that he never sent money to anyone via Western Union or MoneyGram. However, both Coe and Beasley testified that they received money from and dealt directly with Allen. Evidence was also presented regarding the timing of the "Tony Steward" transactions and that Allen was behind those transactions. These discrepancies cannot be characterized as simply a product of Allen's faulty memory.

Moreover, before ruling on Allen's objection, the district court reviewed the trial transcripts, including transcripts of Allen's testimony, and it heard testimony from Agent Stein regarding the "Tony Steward" transactions. Finally, although Allen argues that Coe's testimony was unreliable, the jury obviously believed Coe's version of the events rather than Allen's.

Accordingly, we conclude that the district court did not clearly err in applying a sentencing enhancement under § 3C1.1 for obstruction of justice.

### III.

For the reasons given, the district court did not clearly err in overruling any of Allen's objections to his sentence. We therefore AFFIRM the district court's judgment.