# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
February 2, 2022

Lyle W. Cayce
Clerk

No. 20-20509

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

SIMONE SWENSON,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:15-CR-402-1

Before KING, COSTA, and WILLETT, *Circuit Judges*.
KING, *Circuit Judge*:

Simone Swenson appeals her conviction for mail fraud under 18 U.S.C. § 1341. She also appeals the application of a vulnerable victims sentencing enhancement under U.S.S.G. § 3A1.1(b)(1) and the restitution imposed by the district court. Because we hold that there was sufficient evidence to support Swenson's conviction and that the district court did not err in its sentencing, we AFFIRM.

No. 20-20509

## I.   FACTS AND PROCEDURAL HISTORY

On July 29, 2015, a grand jury indicted Simone Swenson on four counts of wire fraud and mail fraud based on a scheme to defraud prospective adoptive parents through her adoption agency, Sans Pareil Center for Children and Family Services, LLC ("Sans Pareil"). As alleged in the indictment, the heart of this scheme was Swenson's practice of "double matching"—matching two prospective families with the same birth mother and receiving payments from both families. In September 2019, the case was tried before a jury. The jury returned a verdict of "not guilty" on the two wire fraud counts (counts 1 and 2), and a verdict of "guilty" on the two mail fraud counts (counts 3 and 4). The district court then granted Swenson's motion for judgment of acquittal only as to count 3.

The sole remaining count of conviction, count 4, stemmed from a check for $1,800 to pay for birth-mother expenses sent to Swenson on September 18, 2013.[1] That check, in turn, was related to the double matching of birth-mother Ashley Smolt with two different prospective birth families— Daniel and Christopher Cuschieri (the "Cuschieris") and Annise and Jason Neidrich (the "Neidriches"). The Cuschieris had previously sent Swenson $13,400 in agency fees on June 7 for an adoption match with a potential birth mother; that match eventually fell through. Similarly, the Neidriches had paid Swenson $11,700 on July 1 for a match that eventually failed.

After that failed match, the Neidriches were matched with birth-mother Smolt in mid-September. As part of that match, they were informed on September 12 by e-mail that their agency fees from the previous failed match would be rolled over, but that they needed to pay $1,800 for Smolt's birth-mother expenses. Annise Neidrich also testified that, after this e-mail,

---

[1] All relevant dates are in the year 2013.

No. 20-20509

later phone conversations sowed confusion about whether Swenson was requesting more than $1,800 for birth-mother expenses. Annise Neidrich also testified that, while on vacation at Disney World with her family, she "had been in constant voice mail conversation with [Swenson] that whole week" about the Neidriches continued efforts to send Swenson payment for the birth-mother expenses. At the same time, Swenson had also matched Smolt with the Cuschieris. Daniel Cuschieri testified that he spoke with Swenson on the phone on September 14 about a match with Smolt.

While working with the Cuschieris on the match with Smolt, Swenson was continuing to solicit money from the Neidriches related to their match with Smolt. After not hearing from the Neidriches about the status of the $1,800 payment, one of Swenson's associates at Sans Pareil, Nancy Nauss, e-mailed Annise Neidrich on September 16 at 11:47 a.m. asking if the Neidriches had sent the payment. Annise responded that she had not, but that she would transfer the money online that day. At 1:14 p.m. that same day, September 16, Swenson e-mailed Nauss stating: "I have to recoup some of these expenses that have gone out. I cannot wait any longer." The subject of the e-mail was "Have to rematch ashley and jonah [the name of Ashley Smolt's boyfriend]."

On September 16, Swenson also continued to facilitate the Cuschieris' match with Smolt. Based on an e-mail Daniel Cuschieri sent on September 16, it can be inferred that Swenson and the Cuschieris spoke that day "in relation to [their] match with [Smolt]." That e-mail was sent on September 16 at 6:55 p.m. and said: "Thanks for taking the time to speak with me today. We're very excited. Never received any info - at your leisure, please send when you can[.]" Both Annise Neidrich and Daniel Cuschieri testified that they did not know Swenson had matched Smolt with anyone else and had promised her child to another family.

The next day, September 17, Swenson and her associates continued to solicit funds from the Neidriches. In response to voicemails left by Annise Neidrich, Nauss e-mailed the Neidriches on September 17. That e-mail stated that Nauss had "talked to [Swenson] again just now and the only payment we need right now is the birthmother expenses…1800.00. Hopefuly [sic] this helps!!! Did you mail or wire the check…just asking since you said that you did it yesterday!!!"

On September 18 at 7:36 a.m., Annise Neidrich e-mailed Nauss that she "finally got a hold of a computer that could open the old Wire Instruction email" and that she would "see if [her] bank can wire or send a check today." The Neidriches' bank issued a cashier's check for $1,800 on September 18. However, by that point, Swenson had already e-mailed Nauss at 3:54 a.m. that "Ashley and Jonah are rematched." At 12:28 p.m. that same day Swenson e-mailed the Cuschieris: "You would like to move forward?" and the Cuschieris responded asking Swenson to "let [them] know when [they] should move [forward] in terms of the match fee remainder."

Swenson responded the next day, September 19, with an itemized list of the fees that needed to be paid. The Cuschieris wired the money that day. In the meantime, the Neidriches continued to exchange e-mails with Sans Pareil that demonstrated a belief that they were still matched with Smolt after September 18. These communications include an e-mail from Nauss to Annise Neidrich regarding a "TB [tuberculosis] test" and other ways to check for tuberculosis, and Annise Neidrich's response to that e-mail asking if there was "any update on Ashley?" and inquiring about any further paperwork or funds that needed to be sent.

Neither the Neidriches, the Cuschieris, nor Smolt were informed of the true state of affairs. The Neidriches believed they were matched with Smolt and continued "moving forward with the requirements for adoption"

until they were falsely told on September 26, after Smolt had given birth, that Smolt had changed her mind on allowing them to adopt her child. The Cuschieris had been led to believe that Smolt had been previously matched with a family (the Neidriches) and that that family had decided not to proceed with the adoption. Smolt, who had chosen the Neidriches to adopt her child, believed that they were providing funds to help with her expenses. After giving birth on September 24, Swenson told Smolt that the Neidriches "had backed out" but that "there was another family [the Cuschieris] already prepared and waiting in the emergency room for [her] child." Smolt, who had never heard about the Cuschieris before and "had only agreed on adopting" her child to the Neidriches, decided to keep the baby. The $1,800 cashier's check sent by the Neidriches for birth-mother expenses was eventually returned to them uncashed. In the end, neither the Neidriches nor the Cuschieris adopted Smolt's child.

In addition to the above accounting of the facts, the jury heard testimony from a former Sans Pareil employee. That employee testified that she believed Swenson's efforts to double match birth mothers with multiple prospective families (such as the incident with Smolt, the Neidriches, and the Cuschieris underlying counts 3 and 4 of the indictment) were intentional and that Swenson stood to benefit financially by taking money from more than one prospective family for the same child. In addition, a district director at the agency which regulates adoption centers testified that she had investigated Sans Pareil and seen evidence of double matching, a practice she had never seen employed by an adoption center in her 25 years with the regulating agency. The jury also heard contravening testimony from Swenson, who testified in her own defense that the Neidriches had not actually been matched with Smolt because "they did not send birth parent expense money to finalize the match." She also testified that any

conversations with the Cuschieris were purely speculative, and that Smolt was not actually matched with them until after September 18.

As stated above, Swenson was ultimately convicted on count 4—mail fraud based on a scheme of double matching and misrepresentations that caused the Neidriches to send the $1,800 check on September 18. The district court overruled Swenson's objections, including an objection to the vulnerable victims enhancement, and sentenced Swenson to a below-guidelines 24-month term of imprisonment, a three-year term of supervised release, and a $100 mandatory assessment. The district court also awarded $26,550 in restitution to be paid to the Cuschieris.[2] Swenson timely appeals her conviction, the application of the vulnerable victims enhancement, and the restitution award.

## II.    DISCUSSION

We first discuss whether there was sufficient evidence to support Swenson's conviction for mail fraud. We then turn to Swenson's objections to the sentence and restitution order issued by the district court.

### A. Sufficiency of the Evidence for the Mail Fraud Conviction

Swenson argues that there was insufficient evidence to support her mail fraud conviction, an argument she raised to the district court in her motion for a judgment of acquittal and which is therefore preserved. "We review challenges to the sufficiency of the evidence de novo, applying the same standard as applied by the district court: could a rational jury find that all elements of the crime were proved beyond a reasonable doubt?" *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017). That standard is "highly

---

[2] The district court excluded a restitution award of $12,500 to the Neidriches based on recovery they had received from a prior civil settlement.

deferential to the verdict," *id.* (quoting *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (per curiam)), and, as such, "a defendant seeking reversal on the basis of insufficient evidence swims upstream." *United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997). We must not "reweigh the evidence." *United States v. Zamora-Salazar,* 860 F.3d 826, 832 (5th Cir. 2017). Instead, we "search the record for evidence to support the convictions beyond a reasonable doubt," *Mulderig*, 120 F.3d at 546, and view that evidence "in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury." *Chapman*, 851 F.3d at 376 (quoting *United States v. Wise*, 221 F.3d 140, 147 (5th Cir. 2000)).

"Mail fraud under 18 U.S.C. § 1341 has three elements: '(1) a scheme to defraud; (2) use of the mails to execute that scheme; and (3) the specific intent to defraud.'" *United States v. Evans*, 892 F.3d 692, 711 (5th Cir. 2018) (quoting *United States v. Lucas*, 516 F.3d 316, 339 (5th Cir. 2008)). Therefore, there must be sufficient evidence for a rational juror to have found that the government proved each of these three elements beyond a reasonable doubt. We hold that there was.

First, there was sufficient evidence for the jury to find that Swenson engaged in a scheme to defraud the Neidriches and the Cuschieris by double matching them with Smolt. "'Scheme to defraud' is tricky to define, 'but it includes any false or fraudulent pretenses or representations intended to deceive others in order to obtain something of value, such as money, from the [entity] to be deceived.'" *Evans*, 892 F.3d at 711–12 (alteration in original) (quoting *United States v. Saks*, 964 F.2d 1514, 1518 (5th Cir. 1992)); *see also United States v. McMillan*, 600 F.3d 434, 447 (5th Cir. 2010) ("The first element may be met by a variety of schemes, but the relevant form of the scheme in this case is the deprivation of money or property." (footnote omitted)). There was sufficient evidence for the jury to find that such false representations were present here. The testimony of Annise Neidrich,

Daniel Cuschieri, and Ashley Smolt reasonably supports the finding that Swenson told both the Neidriches and the Cuschieris at the same time that they were each matched with Smolt, and thus would be able to adopt her child. The physical impossibility of both families being able to adopt one single child, absent some Solomonian situation, renders this statement false. There was also sufficient evidence that Swenson made those false statements to obtain something of value—the adoption and birth-mother fees—and to deprive the Neidriches and the Cuschieris of the same. This testimony also dovetailed with the testimony of both a former Sans Pareil employee and the district director of the Texas agency regulating adoptions that Swenson engaged in double matching, and did so in this instance.

Further, the testimony of the implicated families lines up with inferences that can reasonably be drawn from the e-mail evidence. It is reasonable to align Daniel Cuschieri's September 16 e-mail to Swenson about the family's excitement with his testimony that he had spoken to Swenson and been matched with Smolt at least by September 16, if not earlier. Then, for several additional days after that match, Sans Pareil still sought payment from the Neidriches for their match with Smolt. It is also reasonable to infer that the Neidriches e-mailed with Sans Pareil about the logistics of adopting Smolt's child after September 18 because Sans Pareil, and Swenson, had convinced them that they were still matched with Smolt, when in actuality Swenson had matched Smolt with the Cuschieris. The jury was within its rights to credit this testimony and evidence over Swenson's contrary testimony, and to find a scheme to defraud. *See United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) ("The jury 'retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses.'" (quoting *United States v. Loe*, 262 F.3d 427, 432 (5th Cir. 2001))).

Second, a reasonable jury could have found that Swenson used the mails to further her fraudulent scheme. "The gravamen of the offense is the

scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting *Schmuck v. United States*, 489 U.S. 705, 712 (1989)). When considering the relationship between a mailing and a fraudulent scheme, "the question . . . is whether the mailings themselves somehow contributed to the successful continuation of the scheme—and, if so, whether they were so intended by [the defendant]." *United States v. Strong*, 371 F.3d 225, 230 (5th Cir. 2004). Swenson challenges the nexus between the double-matching scheme and the $1,800 check sent by the Neidriches. She argues that any misrepresentations made to the Neidriches about the status of their match with Smolt (i.e., that she was still matched with the Neidriches) occurred after the check was sent, and therefore could not have been part of any fraudulent scheme.

However, a reasonable jury could have concluded that the fraudulent double-matching scheme existed by September 16, or earlier, and therefore predated the mailing of the check on September 18. The Neidriches and Smolt both testified that Swenson represented that they were matched, and that the Neidriches would adopt Smolt's child. As part of this match, Swenson and her employees asked the Neidriches to pay $1,800 for birth-mother expenses, and repeatedly pressed the Neidriches to pay that sum. The Neidriches then did so, based on the representation that the payment was related to the match. "One 'causes' the mails to be used '[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen. . . .'" *United States v. Ingles*, 445 F.3d 830, 835 (5th Cir. 2006) (quoting *Pereira v. United States*, 347 U.S. 1, 8–9 (1954)). It would clearly be part of the ordinary course of business, and reasonably foreseeable, that the Neidriches would respond to Sans Pareil's repeated requests by mailing Sans Pareil a check.

No. 20-20509

And it was eminently reasonable for a jury to look at the evidence and see that Swenson had matched Smolt with the Cuschieris while simultaneously requesting payment from the Neidriches. The Cuschieris testified that, in conversations that occurred before September 18, Swenson matched them with Smolt. Swenson gave no indication to the Neidriches that she was rematching Smolt with the Cuschieris, or that their match was otherwise in danger. Instead, the evidence can be inferred to show that Swenson and her employees continued to request money from the Neidriches under the false pretense that they were matched with Smolt, when in fact Swenson had rematched Smolt with the Cuschieris. It was reasonable to view the facts as showing that Swenson had rematched Smolt before September 18, and that her representations to the contrary caused the Neidriches to mail Swenson an $1,800 check. A reasonable jury could find the second element of mail fraud to be satisfied.[3]

---

[3] Even granting the most generous timeline of when Smolt was matched with the Cuschieris, the jury still could have found that the September 18 check was related to Swenson's fraud. Swenson at the very least rematched Smolt with the Cuschieris by 3:54 a.m. on September 18 when she e-mailed Nauss that "Ashley and Jonah are rematched." This was before Annise Neidrich mailed the check to Sans Pareil—a check that the jury could reasonably have found that Swenson had repeatedly solicited from the Neidriches and knew was coming. Therefore, the jury could have found that the failure to inform the Neidriches that Smolt had been rematched was a material, fraudulent omission. *See, e.g.*, *United States v. Biesiadecki*, 933 F.2d 539, 543 (7th Cir. 1991) ("Fraud can arise not only through affirmative misrepresentations but also through concealment of material facts."); *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985), *cert. denied*, 476 U.S. 1183 (1986) ("It requires no extended discussion of authority to demonstrate that omissions or concealment of material information can constitute fraud . . . cognizable under the mail fraud statute, without proof of a duty to disclose the information. . . ."); *United States v. Jamieson*, 427 F.3d 394, 415 (6th Cir. 2005); *United States v. Pearlstein*, 576 F.2d 531, 535 (3rd Cir. 1978); *Ingles*, 445 F.3d at 835 n.11 (including a material omission in the definition of mail fraud (citing *Neder v. United States*, 527 U.S. 1, 22–25 (1999))); *United States v. Plato*, 593 F. App'x 364, 369 (5th Cir. 2015) (per curiam). *But see United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986) (stating that Ninth Circuit precedent held that

No. 20-20509

Third, there was sufficient evidence to find that Swenson had the specific intent to defraud in executing the double-matching scheme. "A defendant 'acts with the intent to defraud when he acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself.'" *United States v. Evans*, 892 F.3d 692, 712 (5th Cir. 2018) (quoting *United States v. Umawa Oke Imo*, 739 F.3d 226, 236 (5th Cir. 2014)). There must also be a nexus between the deception and the intended loss or gain. The fraudster must act so "that the given result (the 'end') is achieved, at least in part, *through* the specified action, instrument, or method (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental." *Loughrin v. United States*, 573 U.S. 351, 363 (2014).[4]

That element is satisfied here. There was evidence that Swenson misled the Neidriches about the status of their match with Smolt (the "means") so that they would send a check for $1,800 to pay for birth-mother expenses to which Swenson was not actually entitled (the "end"). There was evidence that Swenson made the misrepresentations about the match knowing and intending to gain $1,800, and to deprive the Neidriches of the same. There was evidence that Swenson regularly, and intentionally, double

---

"omission or non-disclosure of material facts by a non-fiduciary" cannot support a mail fraud conviction).

[4] While *Loughrin* was interpreting the bank fraud statute, 18 U.S.C. § 1344, we have noted that precedents based on that statute can be used when interpreting the mail fraud statute, 18 U.S.C. § 1341, since the bank fraud statute was modeled on the mail and wire fraud statutes. *See United States v. Saks*, 964 F.2d 1514, 1520 (5th Cir. 1992) ("It is well settled that Congress modelled § 1344 on the mail and wire fraud statutes, and that the usual practice is to look to precedents under those statutes to determine its scope and proper interpretation.").

matched families. A reasonable jury could look at that evidence and see intent to defraud.

The fact that the check was eventually returned to the Neidriches is of no moment. First and foremost, to prove fraud, the government "is not required to prove that any victim actually suffered a loss." *United States v. McMillan*, 600 F.3d 434, 450 (5th Cir. 2010). To satisfy the intent requirement, the defendant need only have *intended* that her scheme either lead her to gain something of value or lead another to lose something of value. To prove intent, the scheme does not have to actually have worked. If a defendant conceives of a scheme to sell nonexistent oil wells in her backyard, and solicits a check from a person for the purchase of one of the wells, then the defendant has acted with the intent to commit mail fraud; that remains true whether the victim puts a stop on the check or if the defendant decides not to cash the check. *See United States v. Ratcliff*, 488 F.3d 639, 645 n.7 (5th Cir. 2007) ("Of course, the mail fraud statute does not require a completed fraud, just that the defendant has 'devised or intend[ed] to devise' a scheme to defraud." (citing 18 U.S.C. § 1341; *Neder*, 527 U.S. at 25 (1999))). The same is true here. Regardless of whether the check was cashed or not, a jury could reasonably have concluded that Swenson acted with the intent to cause the Neidriches to mail it. That is sufficient to satisfy the intent element of mail fraud.[5]

---

[5] In any event, while not required to satisfy the intent element, we note that a loss did actually occur because the Neidriches were deprived of their property rights to the $1,800 while Swenson possessed the cashier's check. If a person suffers a loss due to deception, it is fraud, even if the fraudster does not actually see a profit. *See, e.g.*, *Shaw v. United States*, 137 S. Ct. 462, 467 (2016) ("We have held it 'sufficient' that the victim . . . be 'deprived of its right' to use of the property, even if it ultimately did not suffer unreimbursed loss." (citing *Carpenter v. United States*, 484 U.S. 19, 26–27 (1987))); *Ratcliff*, 488 F.3d at 648 ("We have not suggested that a mail fraud scheme must actually cause a financial loss to the victim, merely that a scheme to defraud a victim of money or

In addition, the jury was within its rights to credit the testimony of the former Sans Pareil employee that Swenson routinely, and intentionally, collected fees from multiple sets of double-matched families. That testimony reasonably demonstrates that Swenson intentionally sought to at least cause pecuniary loss as part of the double-matching scheme which included the solicitation of the $1,800 check from the Neidriches. To credit the act of returning this single check against that testimony of intentionality would be an improper reweighing of the evidence. *United States v. Zamora-Salazar*, 860 F.3d 826, 832 (5th Cir. 2017). Instead, we must examine "the evidence 'in the light *most favorable to the verdict*.'" *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017) (emphasis added) (quoting *United States v. Wise*, 221 F.3d 140, 147 (5th Cir. 2000)). Viewed through that lens, the evidence reasonably shows that Swenson perpetrated her scheme to intentionally and fraudulently acquire funds.

Swenson counters by citing *United States v. Takhalov* (*Takhalov I*) and arguing that there was no intent to defraud the Neidriches because they "received exactly what they paid for"—fees related to their opportunity to adopt a child. 827 F.3d 1307, 1314 (11th Cir. 2016) (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)). In that case, a bar hired women (called B-girls) "to pose as tourists, locate visiting businessmen, and lure them into the defendants' bars and nightclubs." *Id.* at 1310. In considering whether a jury instruction was appropriate, the Eleventh Circuit stated that there was no intent to defraud in the scheme because the businessmen received what they paid for—drinks at the bar—even if there were lies that

property, if successful, must wrong the victim's property rights in some way."); *United States v. Baker*, 923 F.3d 390, 404–05 (5th Cir. 2019).

led them there along the way. *Id.* at 1313–14. However, the temporal elements discussed above separate this case from *Takhalov*. As previously stated, it was reasonable for the jury to conclude that Swenson had matched Smolt with the Cuschieris while simultaneously soliciting funds from the Neidriches based on their match with Smolt. If so, the Neidriches were not receiving what they paid for. They were paying fees to adopt Smolt's child, which they would not be able to do because of the match with the Cuschieris. The argument that the Neidriches received what they paid for cannot be used to overturn a verdict finding Swenson had the intent to defraud.

Swenson also cites a later opinion in *Takhalov* where, on a motion for panel rehearing, the court considered an additional charge of fraud. *United States v. Takhalov* (*Takhalov II*), 838 F.3d 1168 (11th Cir. 2016) (per curiam). As to that charge, after a customer, who entered the bar because of the B-girls, later challenged credit card charges he had incurred there, the bar owner lied to American Express about the nature of his business relationship with the B-girls. *Id.* at 1169–70. However, by the time this misrepresentation had been made, American Express had already upheld the charge; therefore, there was no fraud because by the time the bar owner had sent the e-mail "he had nothing left to gain." *Id.* Swenson argues that her case is similar because any misrepresentations about the status of the Neidriches' match made after the check was sent on September 18 could not cause the check to be sent; therefore, she could not gain anything through her misrepresentations.

But, again, the timeline that was reasonably found by the jury belies this argument. The evidence demonstrated that Swenson had already matched Smolt with the Cuschieris while she was still requesting money from the Neidriches, and before the check was mailed. Swenson very much had something to gain by virtue of her false representations that the Neidriches were matched with Smolt—$1,800 in fees for birth-mother expenses. That fact separates this case from *Takhalov II*. In sum, there is sufficient evidence

to demonstrate that Swenson intentionally sought to use false representations to acquire the September 18 check from the Neidriches. Because there was sufficient evidence to support all three elements of Swenson's conviction for mail fraud, the jury's verdict must stand.

### B. Vulnerable Victim Enhancement

In addition to challenging her conviction, Swenson also challenges her sentence. Specifically, she asserts that the district court erroneously applied a two-level sentencing enhancement under U.S.S.G. § 3A1.1(b)(1) that applies when a crime affects an "unusually vulnerable victim." "Review of a district court's interpretation of the Sentencing Guidelines is *de novo* and review of a district court's application of 'unusual vulnerability' in the arena of sentencing is for clear error." *United States v. Wilcox*, 631 F.3d 740, 753 (5th Cir. 2011). We "must determine whether the district court's conclusion was plausible in light of the record as a whole," keeping in mind that "the determination of whether a victim is vulnerable is a factual finding that the district court is best-suited to make." *Id.* at 753–54. The district court did not commit error in finding that Swenson's fraud affected vulnerable victims.

The vulnerable victim enhancement is primarily focused on the diminished ability of the victim to thwart or resist the crime at hand. *See* U.S.S.G. § 3A1.1 cmt. n.2. (defining a vulnerable victim as one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct").[6] One of the specific categories of vulnerable victims we have found are those who are "less able to resist than the typical victim of the offense of the conviction."

---

[6] In addition, we do "not require[] a specific 'targeting' of a vulnerable victim beyond the requirement that the defendant knew or should have known of the vulnerability." *United States v. Burgos*, 137 F.3d 841, 843–44 (5th Cir. 1998).

*Wilcox*, 631 F.3d at 755 (quoting *United States v. Angeles-Mendoza*, 407 F.3d 742, 747 n.5 (5th Cir. 2005)). The district court clearly found that the victims of Swenson's fraud—prospective adoptive families—were less equipped to defend against the crime of mail fraud than the standard victim of that crime. The court found that the victims were "vulnerable by virtue of desperation and extraordinary hope, hope that might blink at experience." It further noted that adoption, as compared to other industries, "is an odd business transaction" featuring "the purchase of a baby in order to make that baby a member of a beloved family and loving family."

The district court's view of the victims of this crime was not clearly erroneous. Mail fraud can cover all manner of sins, from health care fraud, *United States v. Umawa Oke Imo*, 739 F.3d 226, 230 (5th Cir. 2014), to prize schemes, *United States v. Tansley*, 986 F.2d 880, 883 (5th Cir. 1993), to the fraudulent sale of water softeners, *Blachly v. United States*, 380 F.2d 665, 668–69 (5th Cir. 1967). The victims of mail fraud, therefore, will run the gamut of susceptibility depending on the nature of a given scheme. And it was well within the district court's purview to find that these families who had invested "extraordinary hope" into the adoption process, who were "desperat[e]" to bring a child into their family, would demonstrate an "*unusual* vulnerability which is present in only some victims of that type of crime." *Angeles-Mendoza*, 407 F.3d at 747 (quoting *United States v. Moree*, 897 F.2d 1329, 1335 (5th Cir. 1990)). Further, it was not clear error to find that Swenson, due to her experience in the adoption field, "knew or should have known of the vulnerability." *Burgos*, 137 F.3d at 843–44. The district court's application of the sentencing enhancement was not clear error.

## C. Restitution

Swenson lastly challenges the district court's decision to issue a restitution order of $26,550 to be paid to the Cuschieris, to which Swenson

did not object. Swenson argues that the award cannot stand because it includes the June 5 payment of $13,400 for adoption fees that formed the core of count 3, for which Swenson was ultimately acquitted. *United States v. Swenson*, 459 F. Supp. 3d 819, 827 (S.D. Tex. 2020). Therefore, she posits, the restitution award includes activity that was not part of the conduct for which she was convicted.

As an initial matter, the parties disagree about whether de novo review or plain error review applies to the restitution order since Swenson did not object to the restitution order at sentencing. *Compare United States v. Nolen*, 472 F.3d 362, 382 (5th Cir. 2006) (holding that an unpreserved challenge to a restitution order is reviewed de novo), *with United States v. Maturin*, 488 F.3d 657, 660 (5th Cir. 2007) (applying plain error review when a defendant does not object to the restitution order). We have previously noted this conflict in *United States v. Bevon*, 602 F. App'x 147, 151 (5th Cir. 2015) (per curiam). As we stated in *Bevon*, *Nolen* applies under the rule of orderliness as it is the earliest case to address the issue. *Id.*; *see Shami v. Comm'r*, 741 F.3d 560, 569 (5th Cir. 2014) ("When panel opinions appear to conflict, we are bound to follow the earlier opinion." (quoting *H&D Tire & Auto.-Hardware, Inc. v. Pitney Bowes Inc.*, 227 F.3d 326, 330 (5th Cir. 2000))). We therefore apply de novo review to the restitution order.

"The general rule is that a district court can award restitution to victims of the offense, but the restitution award can encompass only those losses that resulted directly from the offense for which the defendant was convicted." *Maturin*, 488 F.3d at 660–61. A victim is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* at 661 (quoting 18 U.S.C. § 3663A(a)(2)). However, we have held that "where a fraudulent scheme is an element of the conviction, the court may award restitution for 'actions

pursuant to that scheme.'" *United States v. Cothran*, 302 F.3d 279, 289 (5th Cir. 2002) (quoting *United States v. Stouffer*, 986 F.2d 916, 928 (5th Cir. 1993)). Mail fraud is such a crime. 18 U.S.C. § 1341. Therefore, the award stands if the Cuschieris were "directly harmed by [Swenson's] course of criminal conduct." *United States v. Mathew*, 916 F.3d 510, 516 (5th Cir. 2019) (quoting *United States v. Hughey*, 147 F.3d 423, 437 (5th Cir. 1998)).

We hold that the June payment made by the Cuschieris was part of the harm they suffered from Swenson's criminal scheme, and that the restitution award was therefore proper. This conclusion stems at least in part from the purpose of restitution. In passing the Mandatory Victims Restitution Act, Congress' goal was to ensure that "federal criminal defendants . . . pay full restitution to the identifiable victims of their crimes." Catherine M. Goodwin, Federal Criminal Restitution § 2:16 (2021) [hereinafter, Federal Criminal Restitution]. Here, as one of the two families matched with Smolt, the Cuschieris are identifiable victims of Swenson's scheme. Because the June payment of the $13,400 agency fee was rolled over to the fraudulent Smolt adoption, it was a loss and a direct harm that the Cuschieris suffered as a result of "actions pursuant to [Swenson's] scheme." *Stouffer*, 986 F.2d at 928. The Cuschieris should be compensated for that loss.

This conclusion is buttressed by the fact that, in acquitting Swenson on count 3, the district court focused on the lack of evidence of Swenson's fraudulent intent in June, and not on whether the Cuschieris suffered a loss. The court framed its analysis around our "instruct[ions] that even if a mailing contributes to a scheme's success, the prosecution must also show that the defendant intended that result." The court looked to what was "in Swenson's mind in June[]," concluding that "[t]he government's case falters because of . . . its lack of specific evidence as to the *purpose* of the June

mailing when it occurred." The failure to prove the intent required for a mail fraud conviction formed the core of the court's decision to acquit Swenson on count 3.

But restitution asks a different question—who was harmed by the criminal conduct? In many ways, the "terminology [surrounding restitution] invokes obvious connotations of a proximate cause standard of causation, a familiar legal concept used in civil, contract, and criminal law." FEDERAL CRIMINAL RESTITUTION § 2:17; *c.f. United States v. Calderon*, 944 F.3d 72, 95 (2d Cir. 2019). Swenson's criminal conduct that led to her conviction on count 4 proximately harmed the Cuschieris, who still lost $13,400 in a fraudulent double match. The district court's decision supports that conclusion. Even while acquitting Swenson on count 3, the district court stated that the June mailing still could have "ultimately contributed to the scheme because Swenson kept the money . . . and applied the money to the alleged double match with Smolt." As this statement demonstrates, Swenson used the $13,400 as part of the fraudulent scheme, and therefore her criminal conduct harmed the Cuschieris in that amount.

A comparison to our unpublished decision in *Bevon* is instructive. In that case, Bevon pleaded guilty to multiple fraud counts based on a myriad of schemes. *Bevon*, 602 F. App'x at 148–50. The district court ordered restitution that included compensation for payments made with a credit card mistakenly delivered to Bevon, independent of the fraudulent schemes for which she pleaded guilty; the intended recipient was not one of the victims of any of Bevon's frauds. *Id.* at 149–50. We found that portion of the restitution award improper because "[t]he schemes underlying Bevon's offenses of conviction do not include Bevon's conduct involving the fraudulent charges on [that] credit card." *Id.* at 153. The charges on that credit card were wholly unrelated to the schemes which involved "a different

credit card," an unrelated "fraudulent repurchase of her foreclosed home," and "one discrete transaction that was unrelated to [that] credit card." *Id.* at 153–54. In addition, the charges were made *after* the temporal timeframe of the fraudulent schemes. *Id.* at 153. Therefore, there was no connection between the schemes and the credit card charges that could support restitution.

Our case is materially different. Rather than being wholly unconnected to the fraudulent scheme, as was the credit card in *Bevon*, the Cuschieris' payment was rolled over into the fraudulent scheme and subsequently lost. Rather than featuring an entirely different victim, as in *Bevon*, the Cuschieris were named victims of the fraudulent double-matching scheme for which Swenson was convicted. While *Bevon* shows that the word "scheme" in the restitution context is not a panacea that can cover all of a defendant's bad acts, it is broad enough to cover the losses that victims such as the Cuschieris suffered that are proximately related to a defendant's scheme. The Cuschieris should be compensated for that harm, and so the full restitution order of the district court stands.

## III.   CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.