# United States Court of Appeals for the Fifth Circuit

---

No. 23-20491

---

United States Court of Appeals
Fifth Circuit

**FILED**

January 15, 2025

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellee*,

*versus*

Abdul Fatani,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CR-583-11

---

Before Elrod, *Chief Judge*, and Dennis and Higginson, *Circuit Judges*.

Jennifer Walker Elrod, *Chief Judge*:

Abdul Fatani challenges his wire fraud conviction and sentence arising out of his involvement in a fraudulent Paycheck Protection Program loan scheme. For the reasons that follow, we affirm the judgment of the district court but remand for correction of a clerical error in the judgment.

I

The Paycheck Protection Program (PPP) was a COVID-19 relief program administered by the Small Business Administration. Under the

PPP, small businesses could apply for loans to be used to pay payroll costs, interest on mortgages, rent, and utilities.  The loan amount was calculated based on the business's average monthly payroll expenses.  To apply, the business had to provide information about its payroll costs and number of employees, including supporting documentation for those costs.  If the funds were used for appropriate expenses, the loan would be forgiven.

Amir Aqeel, one of Fatani's co-defendants, submitted fraudulent PPP loan applications for other people's businesses.  Aqeel and co-conspirators under his direction would input false payroll information for the applications, such as falsified payroll expenses, employee counts, and supporting documentation.  If the loan was approved, the loan proceeds would be divided up between the borrower and the co-conspirators.

At trial, witnesses testified about various potential divisions of the funds.  Mauricio Navia, a co-conspirator, was involved in over twenty "pitch meetings" to recruit PPP borrowers into the scheme.  At those meetings, borrowers were told "what needed to be done" to get the loan and "where the money was going to go."  Navia testified that borrowers were told that 50% of the funds would be used to pay taxes, so if the borrower's company was audited, it would look like the company had the claimed number of employees.  Then, 25% of the funds would go to the borrower and 25% would be split between Aqeel and any other co-conspirators involved.  However, Aqeel would often also keep the 50% supposedly used for taxes.  When Navia's company received a fraudulent PPP loan, Navia kept about 50% of the funds and Aqeel received the other 50%.

Three other witnesses for whom Aqeel submitted loan applications testified similarly.  Muhammad Javaid was told that he would receive 65% of a PPP loan and the co-conspirators would receive 35%.  Kamal Farooq was told that Aqeel would take 33% of the funds from a personal loan obtained for

Farooq, which turned out to be a business loan. Dhian Singh was told that he would receive about 50% of the funds from a PPP loan, while Aqeel would take 25% as his fee and use the remaining 25% to pay Singh's taxes. Aqeel asked Singh to bring him three signed but otherwise blank checks to be used to divide up the funds.

In addition, once the PPP loan was funded, the fraudulent borrower would sign blank checks and give them to Aqeel and Navia, who would fill the checks out as if they were payroll checks to the business's employees. The checks would then be cashed, and the cash would be divided between the borrower and the co-conspirators. These fake payroll checks were created so it would look like the loan funds were used for payroll, as required for the loan to be forgiven.

Fatani was involved in the conspiracy as a borrower, working with the conspiracy members to submit a fraudulent PPP loan application for his company, Route 786 USA, Inc. The application included false information about Route 786's owner, payroll expenses, and number of employees and included fabricated supporting documents. In reality, Route 786 had no employees and no payroll.

Route 786's PPP loan was approved, and loan proceeds of $511,250 were wired to the company's bank account on June 5, 2020. Fatani and his wife were the only signatories on that account. Then, four major transactions occurred.

First, three days after the loan was deposited, Fatani wrote a Route 786 check for $99,800 to A&H Heyville, LLC. A&H Heyville was controlled by Aqeel and another co-conspirator. Fatani signed the check, but Aqeel completed the "pay to" line and the amount.

Second, between June 19 and August 5, Fatani wrote approximately 44 fictitious payroll checks, which were given to Aqeel and cashed. These

checks totaled approximately $155,000. Investigators were unable to determine how much of that cash went to Fatani. Fatani also provided additional signed checks to Aqeel, some of which included "Payroll" on the memo line and amounts and some of which were otherwise blank. None of the PPP loan funds were used for legitimate payroll expenses. Fatani and Aqeel also exchanged several texts about the payroll checks between June 30 and August 14.

Third, and at issue here, on June 26, a $100,000 check drawn on Route 786's account was issued to Tah Investments. The check was signed by Fatani, but Aqeel's handwriting appeared on the "pay to" line. About four days after the check cleared, Fatani texted Aqeel, "100k were taken out just to update." No other $100,000 transactions occurred in late June of 2020. The parties stipulated that the check was used by Aqeel and another co-defendant as payment for a hotel owned by Tah Investments and that the owner of Tah Investments did not know or interact with Fatani.

Fourth, a $100,000 check drawn on Route 786's account was issued to Z Cellular, LLC in July. Fatani and three of his family members were the signatories on Z Cellular's account.

A superseding indictment charged Fatani with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; wire fraud, in violation of 18 U.S.C. § 1343; and engaging in a monetary transaction with criminally derived property, in violation of 18 U.S.C. § 1957. The wire fraud count was based on the $100,000 check to Tah Investments and was indicted as "[a]n electronic transfer via check from Bank 14 to Bank 6." The superseding indictment alleged that "[i]t was the purpose of the conspiracy and scheme to defraud for the defendants and their co-conspirators to unjustly enrich themselves by fraudulently obtaining PPP loans under false and misleading pretenses and to conceal the conspiracy and scheme from law enforcement."

Fatani was tried in a three-day jury trial, and the jury returned a guilty verdict as to all three counts. He moved for a judgment of acquittal during the trial and after the verdict was returned. The district court denied those motions.

For sentencing purposes, Fatani's presentence report calculated an offense level of 22 and a criminal history category of I, resulting in a range of 41 to 51 months' imprisonment under the Sentencing Guidelines. Fatani filed objections to the presentence report and a sentencing memorandum. He asserted that a sentence of 21 months was sufficient but not greater than necessary to comply with 18 U.S.C. § 3553(a). He also requested that his offense level be reduced by two levels under the then-pending zero-point-offender amendment to the Guidelines.

The district court granted Fatani's zero-point-offender request, resulting in an offense level of 20 and a guideline range of 33 to 41 months, which the court treated as a downward variance. It otherwise adopted the presentence report's factual findings and guideline calculations. The district court entered a judgment of conviction and imposed a sentence of 36 months in prison as to each count, to run concurrently; 3 years of supervised release as to each count, also to run concurrently; and restitution in the amount of $511,250. Fatani then appealed.

## II

Fatani asserts that the evidence at trial was insufficient to support his wire fraud conviction. He properly preserved this claim by moving for a judgment of acquittal, so we review the sufficiency of the evidence *de novo*. *United States v. Swenson*, 25 F.4th 309, 316 (5th Cir. 2022). This review is "highly deferential to the verdict." *Id.* (quoting *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2016)). We do not "reweigh the evidence," and we "view th[e] evidence 'in the light most favorable to the verdict, accepting

No. 23-20491

all credibility choices and reasonable inferences made by the jury.'" *Id.* (first quoting *United States v. Zamora-Salazar*, 860 F.3d 826, 832 (5th Cir. 2017); and then quoting *Chapman*, 851 F.3d at 376). The conviction should be affirmed "if 'a rational trier of fact could have found that each element of the charged criminal offense was proven beyond a reasonable doubt.'" *United States v. Arledge*, 553 F.3d 881, 887–88 (5th Cir. 2008) (quoting *United States v. Arnold*, 416 F.3d 349, 358 (5th Cir. 2005)).

"To support a wire fraud conviction, the government must prove: (1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016).[1] On appeal, Fatani does not challenge the first or third element. He challenges the second element, contending that the government did not show that the June 26 check and resulting wire were in furtherance of the scheme to defraud.

For the second element of wire fraud, the wire communication "'need not be an essential element of [a scheme to defraud]' but may instead 'be incident to an essential part of the scheme, or a step in the plot.'" *United States v. Dowl*, 619 F.3d 494, 499 (5th Cir. 2010) (alteration in original) (quoting *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989)). "The

---

[1] The text of the statute reads:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

relevant question at all times is whether the [wire] is part of the execution of the scheme as conceived by the perpetrator at the time . . . ." *Schmuck*, 489 U.S. at 715.[2] Accordingly, we ask whether the wires themselves "somehow contributed to the successful continuation of the scheme—and, if so, whether they were so intended by [the defendant]." *Swenson*, 25 F.4th at 317 (alteration in original) (quoting *United States v. Strong*, 371 F.3d 225, 230 (5th Cir. 2004)). A person "causes" the use of an interstate wire under the statute when he "does an act with knowledge that the use of the [wire] will follow in the ordinary course of business, or where such use can reasonably be foreseen." *Pereira v. United States*, 347 U.S. 1, 8–9 (1954).

Fatani asserts that the scheme to defraud was complete when the PPP loan funds were deposited into Route 786's bank account on June 5. As a result, he contends that the June 26 check could not have been an essential part of that scheme. We disagree.

Generally, "a scheme to defraud is complete when '[t]he persons intended to receive the money had received it irrevocably.'" *Arledge*, 553 F.3d at 892 (alteration in original) (quoting *United States v. Maze*, 414 U.S. 395, 400 (1974)). Thus, in *United States v. Arledge*, we rejected the defendant's argument that the scheme to defraud a settlement fund was complete when the fraudulent settlement claimants were paid. *See id.* Instead, we concluded that the scheme continued until the defendant had "received attorneys' fees for his participation in the scheme to defraud." *Id.* We have also expressly held that "[m]ailings that distribute the proceeds of the scheme to defraud among the perpetrators are 'incident to an essential

---

[2] *Schmuck* and other cases cited herein discuss the mail fraud statutes, 18 U.S.C. §§ 1341, 1342. "[B]ecause the mail and wire fraud statutes share the same language in relevant part, the same analysis applies to each." *United States v. Mills*, 199 F.3d 184, 188 (5th Cir. 1999).

part of the scheme.'" *United States v. Rico Indus., Inc.*, 854 F.2d 710, 713 (5th Cir. 1988) (quoting *Pereira*, 347 U.S. at 8).

Here, there was sufficient evidence that Aqeel was a "person[] intended to receive the money" and that Aqeel receiving his share was an essential part of the scheme. *See Arledge*, 553 F.3d at 892. Aqeel was the one who falsified or directed the falsification of the payroll information necessary for Route 786 to receive a PPP loan. When the co-conspirators explained the fraudulent loan scheme, they told borrowers that the funds would be divided between the borrower and the co-conspirators, including Aqeel. Even innocent borrowers were told that Aqeel would take a percentage of the loan proceeds as his fee. The jury could reasonably infer from this evidence that paying Aqeel—the mastermind behind the scheme—was necessary for Fatani to receive the fraudulent loan. Thus, the division of proceeds between Aqeel and Fatani was an essential part of the scheme to defraud.

It then follows that the June 26 wire at issue was in furtherance of that scheme because the check and wire constituted Aqeel's payment. In fact, at oral argument, Fatani's counsel conceded that the check was part of Aqeel's cut from the scheme. Our review of the record confirms that there was sufficient evidence to support this conclusion. For example, the jury could reasonably infer that Aqeel had not yet received his entire share because witnesses testified that the co-conspirators would receive between 25% and 50% of the loan proceeds. There was also evidence that Fatani intended the check to be Aqeel's payment: similar blank checks were used to pay Aqeel in other instances, and Fatani seemed unfazed by the resulting $100,000 withdrawal. The jury also could have reasonably concluded that it was reasonably foreseeable to Fatani that the check would result in an interstate wire transaction, such as when the check was deposited. *See Pereira*, 347 U.S. at 8–9.

Simply put, because the scheme to defraud was not complete for Aqeel, it was not complete for Fatani. On appeal, Fatani does not challenge the evidence that he joined the scheme to defraud. The purpose of the scheme, as the government consistently alleged and argued, was for all of the co-conspirators, including both Fatani and Aqeel, to unjustly enrich themselves. That scheme was not complete for Aqeel until he received his share, *see Arledge*, 553 F.3d at 892, and Fatani joined that same scheme. As a result, a reasonable jury could conclude that the scheme to defraud was not complete until Aqeel had been paid. Then, based on the above evidence, the jury could also conclude that the check and wire were "part of the execution of the scheme as conceived by [Fatani] at the time." *See Schmuck*, 489 U.S. at 715.

Fatani's arguments to the contrary are unavailing. The fact that Fatani was the sender, not the recipient, of the fraudulent funds does not help him. In other cases, we have described money wires sent by the defendant as furthering a scheme to defraud. *See United States v. Richards*, 204 F.3d 177, 190, 209, 211 (5th Cir. 2000) (describing "the use of . . . wire facilities to distribute the proceeds of the fraud" as one of "the defendants' coordinated acts to implement their fraudulent scheme"), *overruled on other grounds by United States v. Cotton*, 535 U.S. 625 (2002); *United States v. Becker*, 569 F.2d 951, 958, 964 (5th Cir. 1978) (affirming a defendant's wire fraud conviction based on a wire transfer from his bank account to a co-defendant's account because the jury could infer that the money was the co-defendant's "share of the money taken from investors").

Unlike the mailings in *Kann v. United States*, 323 U.S. 88 (1944), and *United States v. Maze*, 414 U.S. 398 (1974), which Fatani cites, the wire here was not mere "post-fraud accounting among the potential victims of the various schemes." *See Schmuck*, 489 U.S. at 714. And although Fatani had already received his share of the money, "acts occurring after the defrauding

defendant already controls the proceeds of the fraud" can still further the scheme to defraud, including actions "taken to avoid detection." *See United States v. Allen*, 76 F.3d 1348, 1362–63 (5th Cir. 1996). Here, there was significant evidence that the scheme to defraud included the concealment of the fraud—namely, writing the fake payroll checks and paying the business's taxes as if it had the correct number of employees. If Aqeel did not receive his share, the whole scheme would fall apart.

A reasonable jury could have found that the check and wire used by Fatani to pay his co-conspirator his share of the proceeds were in furtherance of the scheme to defraud. Accordingly, we affirm Fatani's wire fraud conviction.

## III

Fatani also challenges the substantive reasonableness of his 36-month sentence. He preserved his challenge by arguing for a lower sentence at the district court, so we review his challenge under the abuse of discretion standard. *See Holguin-Hernandez v. United States*, 589 U.S. 169, 173–74 (2020); *United States v. Simpson*, 796 F.3d 548, 557 (5th Cir. 2015). Our review is "highly deferential as the sentencing judge is in a superior position to find facts and judge their import under § 3553(a) with respect to a particular defendant." *Simpson*, 796 F.3d at 557 (quoting *United States v. Campos-Maldonado*, 531 F.3d 337, 339 (5th Cir. 2008)).

A sentence "within or below the calculated guidelines" is presumed to be reasonable. *Id.* A defendant can rebut that presumption "by demonstrating that the sentence: '(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors.'" *Id.* at 558 (quoting *United States v. Warren*, 720 F.3d 321, 332 (5th Cir. 2013)).

Fatani first asserts that his sentence is substantively unreasonable because the loss table used for fraud offenses under U.S.S.G. § 2B1.1 is not based on empirical data and thus does not warrant the same deference. That argument "is foreclosed in this circuit," *id.* at 560, and we reject it again now.

Fatani also contends that the district court failed to adequately consider several mitigating factors under 18 U.S.C. § 3553(a). He points to his family ties, good character, lack of criminal history, medical condition, and role in assisting his arthritic wife with daily tasks. He believes that the district court committed a clear error of judgment by not adequately accounting for those factors.

However, Fatani made the same arguments in his sentencing memorandum. At the sentencing hearing, the district court heard the parties' arguments about and resolved the objections to the presentence report. The court granted Fatani's zero-point-offender request, recognizing his lack of criminal history. It then heard the parties' positions on an appropriate sentence, including the defense's arguments about Fatani's lack of criminal history and family ties, and heard Fatani's allocution. The statement of reasons also states that the district court "determined the defendant would be eligible for this [zero-point-offender] reduction and sentenced the defendant under the provisions of 18 U.S.C. § 3553(a)."

We conclude that Fatani has not demonstrated that his sentence was substantively unreasonable. As the government notes, "a checklist recitation of the [§] 3553(a) factors is neither necessary nor sufficient for a sentence to be reasonable." *United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006). We also do not "reweigh the district court's calculus of the relevant factors." *United States v. Douglas*, 957 F.3d 602, 609–10 (5th Cir. 2020). Fatani's arguments amount to "disagreement with the district court's sentence," which does not rebut the presumption of reasonableness afforded his below-

No. 23-20491

guidelines sentence. *See Simpson*, 796 F.3d at 559 & n.63. He has not shown that the district court failed to account for a factor that should have received significant weight, gave significant weight to an improper factor, or made a clear error in judgment in balancing the sentencing factors. *See id.* at 558. As a result, we affirm Fatani's sentence.

\* \* \*

For the foregoing reasons, we AFFIRM the district court's judgment, but we REMAND[3] the case for correction of the written judgment to reflect the lack of an aiding and abetting conviction.

_____

[3] We note that there is a clerical error in the written judgment. The judgment lists Fatani's offenses of conviction as conspiracy to commit wire fraud, aiding and abetting wire fraud, and aiding and abetting engaging in a monetary transaction with criminally derived property. However, Fatani was not convicted under an aiding and abetting theory. Accordingly, we remand to the district court for correction of the judgment pursuant to Federal Rule of Criminal Procedure 36. *See United States v. Cooper*, 979 F.3d 1084, 1088–89 (5th Cir. 2020); Fed. R. Crim. P. 36.